IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
January 7, 2003 Session

## GLEN BERNARD MANN v. STATE OF TENNESSEE

**Direct Appeal from the Circuit Court for Dyer County**
**No. C93-337, 338     Russell Lee Moore, Jr., Judge**

----

**No. W2002-00260-CCA-R3-PD  - Filed October 9, 2003**

----

The petitioner, Glen Bernard Mann, appeals the trial court's denial of post-conviction relief.  In 1994, the petitioner was sentenced to death by a jury for the premeditated first degree murder of Anne Lou Wilson, a sixty-two-year-old widow.  He was also convicted and sentenced to twenty-five years for aggravated rape and six years for aggravated burglary of the same victim.  The convictions and sentences were affirmed on direct appeal by both this Court and the Tennessee Supreme Court. The petitioner is seeking post-conviction relief for, *inter alia*, ineffective assistance of counsel at both the guilt and penalty phase of his trial.  The post-conviction court, after a hearing, found the petitioner failed to carry his burden of proving by clear and convincing evidence that his trial counsel was ineffective.  After review, we affirm the post-conviction court's denial of post-conviction relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which DAVID G. HAYES and ALAN E. GLENN, JJ., joined.

Donald E. Dawson, Post-Conviction Defender, and Catherine Y. Brockenborough, Assistant Post-Conviction Defender, for the appellant, Glen Bernard Mann.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; Gill E. Geldreich, Assistant Attorney General; and C. Phillip Bivens, District Attorney General, for the appellee, State of Tennessee.

### OPINION

### Background

On August 9, 1993, the petitioner was indicted on six counts, two relating to robbery and assault, and four related to the murder, rape, and aggravated burglary of the victim, Anne Lou Wilson:

**Murder, Rape and Aggravated Burglary Counts:**

(1) Premeditated first degree murder, in violation of Tennessee Code Annotated section 39-13-202;
(2) Felony first degree murder (during the perpetration of burglary and/or rape), in violation of Tennessee Code Annotated section 39-13-202;
(3) Aggravated rape, in violation of Tennessee Code Annotated section 39-13-502; and
(4) Especially aggravated burglary, in violation of Tennessee Code Annotated section 39-14-404.

**Robbery and Assault Counts:**

(1) Robbery, in violation of Tennessee Code Annotated section 39-13-401;
(2) Assault, in violation of Tennessee Code Annotated section 39-13-101.

## Facts

After a jury trial, the petitioner was convicted on June 4, 1994, of premeditated first degree murder, aggravated rape, and aggravated burglary. The proof as set out at the jury trial was summarized by our supreme court as follows:

[W]ilson was last seen alive on Friday night, July 2, 1993, by two friends who gave her a ride home from the West Tennessee Opry or "Boogie Barn." According to the proof at trial, Wilson, along with her two friends, regularly attended the Boogie Barn on Friday and Saturday nights. Wilson could not drive and would get a ride to the Boogie Barn with her daughter or her friends and would usually ride home with her friends when the establishment closed at 11:00 p.m.

After dinner on July 2, Wilson's daughter dropped her off at the Boogie Barn. Wilson rode home with her friends, arriving at approximately 11:30 p.m. After making arrangements to pick her up the next evening and waiting until she was safely inside her home, they left. The next day when her friends stopped by at the designated time, Wilson was not waiting for them on the porch, as was her habit, and they were unable to get a response at the front door. Believing that Wilson had decided to ride with her daughter, they continued to their destination, but Wilson never arrived at the Boogie Barn that evening.

Wilson's daughter, Lottie McPherson, also testified that she was unable to contact her mother by telephone on Saturday, July 3, but assumed her mother was out visiting friends. The next day, after attempting several times more to reach her mother by phone, McPherson became concerned and drove to Wilson's home to check on her. When she arrived, McPherson noticed that the mail had not been removed from the

-2-

mailbox on Saturday. Fearing that her mother was physically ill, McPherson proceeded to the front door with a key ready, but found that the door was not locked. Upon entering the house, McPherson saw her mother's body lying in the floor of the bedroom, on the left side of the bed. McPherson said her mother's skin was cold and there was blood all around her body. After seeing her mother, McPherson went outside and called 911.

Upon arriving at the scene, police found Wilson's partially nude body on the floor to the left of the bed. Wilson was lying on her back, with her left arm over her head. She had been stabbed numerous times and severely beaten. The front of her night gown and panties had been torn. A large amount of blood was on her head and chest. Blood also was on her legs and arms and at various places in the room, including on the carpet and bed. Investigating officers found several items near the body, including a broken ceramic cat, a brassiere, pieces of white underwear, and a box containing Wilson's hearing aid. From the kitchen floor, officers removed a piece of linoleum which contained a bloody shoe print.

After securing the scene, officers began interviewing neighbors. Tammy Palmer, who lived four houses down from the victim, gave a statement and thereafter testified at trial that, as she was leaving for work on Saturday, July 3, 1993, at approximately 5:00 a.m., she noticed a man walking down the street. He was wearing orange shorts and no shirt and appeared to weigh 180 to 200 pounds and be between 5'10" and 6'0" in height. Palmer said that when she came out of her house, the man stopped for a few seconds and looked up the driveway toward her. Shortly after the murder, police asked Palmer if she could identify the man she had seen from a group of photographs. Palmer selected a person other than the defendant, but told officers she was not sure that the person in the chosen photograph was actually the man she had seen. Palmer informed the officers that she would need to see the man in person to positively identify him. At trial, Palmer identified the defendant as the man she had seen that morning. Palmer had never seen Mann prior to the morning of the murder, and had not seen him since that time until the day of her testimony.

Officers also spoke with the defendant, who lived about six houses down from the victim and was sitting on his porch the morning of the murder. Mann acknowledged that he knew the victim and said that he and his wife were friends of Wilson and previously had eaten dinner at her home. Mann consented to a search of his house and allowed the officers to take a pair of tennis shoes, some shoe strings, red shorts, and a shirt for further testing. A few days later, the officers obtained a search warrant to collect blood and saliva samples from the defendant.

On July 7, 1993, police investigators asked the defendant and several members of his family to accompany them to the police station for questioning. Although no charges had been brought, the defendant was advised of his constitutional rights. During the

initial interview, Mann denied any involvement in Wilson's murder. Mann said that Wilson had been generous to him and his family by providing them meals and allowing them to use her phone. He claimed that he had not even been in the neighborhood at the time of her murder. When confronted with inconsistencies in his alibi, however, Mann admitted that he had broken into Wilson's home and killed her. However, this interview was not tape-recorded due to an oversight by the investigating officers. Though he initially refused, after being allowed to speak with his wife, Mann gave another statement which was recorded.

During this interview, Mann said that he awoke on Saturday, July 3, and decided to walk around his neighborhood. He was wearing red shorts, white "K-Swiss" shoes, and no shirt. He remembered seeing a woman standing in her driveway as he walked through the neighborhood. He stopped for a moment, but continued walking and at some point, decided to go to Wilson's home, intending to steal her television and pawn it to get money to pay his rent. He arrived at Wilson's home at approximately 6:00 a.m. After knocking on the front door several times and receiving no answer, Mann shoved the door open with his shoulder and walked toward the television. When Mann saw Wilson coming out of the bedroom, he grabbed a sheet off the couch, threw it over her head so that she could not see him, and ran towards the front door. When Wilson pulled the sheet off her head and called out his name, Mann ran back and pushed Wilson into the bedroom and onto the bed.

The precise order in which events occurred thereafter is not exactly clear, but the evidence established that Wilson, who was hearing impaired, reached for the box containing her hearing aid. Mann knocked it out of her hand. As Wilson continued to call Mann's name, he grabbed a sheet from the bed, covered her face, and held her down by placing his hand around her neck. At some point while she was on the bed, and before she was struck in the head, Mann tore off Wilson's underwear, digitally penetrated her vagina while masturbating, and ejaculated onto her body. Mann grabbed a ceramic cat statue and struck the victim twice in the head with it, knocking her to the floor on the left side of the bed. While the victim lay on the floor, Mann ran to the kitchen and obtained a knife. According to Mann, the victim was conscious and calling out his name during this time. Upon returning to the bedroom, Mann stabbed Wilson in the chest several times, because, at first, the knife "wouldn't go in." Finally, he "pulled the knife out, got up and went home." When Mann arrived home, his wife was asleep. He washed his hands with a blue wash cloth and went to bed, but was unable to sleep because he was "hurting." Mann said that he later burned the shorts he was wearing and discarded the knife he had used near a levee.

Mann specifically denied telling anyone, other than the police, about the facts of the murder. Denying that he had intended to kill Wilson, Mann said that he only had intended to steal her television and pawn it for rent money, and that he had

specifically chosen her house because he knew she was hearing impaired and thought he could get in and out without being detected. Mann attempted to describe the strange feeling that had come over him before he committed the murder. He denied being under the influence of drugs at the time of the killing and repeatedly told the interrogating officer that he had a problem and needed help. Mann did not testify at trial, but the recorded confession was played for the jury.

Dr. O'Bryan Clay Smith, the Deputy Chief Medical Examiner for West Tennessee, performed the autopsy on Wilson's body. Dr. Smith opined that Wilson had sustained at least fifteen blows to the head by blunt force, resulting in lacerations, bruises and abrasions. Some of the injuries were consistent in pattern with the broken portion of the ceramic cat. Dr. Smith testified that such head injuries can be fatal, but did not cause instantaneous death in this case.

Dr. Smith testified that Wilson also had suffered fourteen superficial stab wounds to the abdomen, and eleven separate stab wounds to the chest area, ranging in depth from just under one inch to over four inches. One of the stab wounds penetrated Wilson's lung and had a portion of her night gown embedded in it. Another wound penetrated the left ventricle of her heart. Dr. Smith determined that either wound would have been fatal, and could have resulted in death in as little as several minutes or as long as an hour following infliction of the wound. The wounds did not, however, result in instantaneous death. Dr. Smith also found injuries to Wilson's neck consistent with manual strangulation, but concluded that these injuries did not result in instantaneous death. The autopsy revealed that Wilson had sustained two fractured ribs as a result of the stab wounds. She suffered a laceration of the vaginal tissue, which, Dr. Smith opined, was caused by an object being forcefully placed in her vagina. The autopsy revealed extensive swelling around Wilson's left wrist and thumb area as well as deep bruising in the left wrist region, which extended into the tendon sheath of the wrist itself. This bruising was caused by considerable blunt force and was consistent with defensive wounds. Dr. Smith concluded that Wilson died from multiple injuries: blunt force to the head, compressive forces applied to the neck, and multiple stab wounds to the chest and abdomen, but he was unable to determine in which order the wounds were inflicted. Based on the pattern of dried blood on Wilson's left arm and right leg, however, Dr. Smith concluded that Wilson was in an upright position for some period of time after the blows to her head were inflicted.

A Tennessee Bureau of Investigation (T.B.I.) forensic specialist in shoe and tire track comparisons and fiber and physical comparisons testified at trial. She had performed a shoe track comparison on the white tennis shoes recovered from Mann's home and the partial foot print on the piece of linoleum recovered from the victim's home and determined that the shoes were consistent in size, shape, and tread design with the print on the linoleum. No definitive match was possible, however, since no

individual characteristics, such as cuts, tears, or wear patterns were present on the shoes. In addition, she had compared three knives recovered from Mann's home with the cuts in the victim's nightgown and had concluded that any of the knives could have made the cuts. Finally, she found no evidence of fiber transfers from another source onto the victim's clothing or bedding.

Also testifying for the State was a T.B.I. serology specialist who said she found human blood on one of the white tennis shoes, but the quantity was insufficient to conduct further testing. No blood was found on the orange shorts recovered from Mann's home. Although human blood was found on the blue wash cloth recovered from Mann's house, the blood was preserved for DNA analysis, so no further testing was performed. On the ceramic cat removed from the scene of the crime, blood consistent with that of the victim was found. Finally, semen and spermatozoa were found in combed pubic hair obtained from the victim's body.

Due to problems with the manner in which evidence was collected and stored, the forensic DNA analyst with the T.B.I. testified that she was only able to perform adequate DNA testing on a pair of Mann's socks and a pair of red shorts. Blood was found on these items, but it matched that of Patrick Sweat, an individual with whom Mann had fought on July 1, 1993, two days before Wilson's murder.

The defendant offered no proof during the guilt phase of the trial.

State v. Mann, 959 S.W.2d 503, 505-508 (Tenn. 1997) (footnote omitted).

**Sentencing Hearing:**

The evidence adduced at the subsequent sentencing hearing was summarized by our supreme court as follows:

Dr. Smith again testified for the State. He stated that the fifteen blows to Wilson's head would have been severely painful and caused profuse bleeding, but were probably "insufficient to cause unconsciousness." Because the blows were inflicted with moderate to severe force which would have produced a large amount of medium velocity blood spatter, and because the crime scene did not reflect the expected blood spatter, Dr. Smith concluded that the victim's head was probably wrapped in a blanket. Dr. Smith also observed that the manual strangulation, evidenced by the bruises on the victim's neck, would have been painful, causing "extreme distress as [the victim became] hungry for air." Though the stab wounds which penetrated the victim's heart and lung would have caused pain and bleeding, and interfered with Wilson's ability to breath, Dr. Smith determined that none of the wounds caused instantaneous death. Likewise, although not fatal, the abdominal puncture wounds

would have caused moderate pain and minimal bleeding. Dr. Smith opined that all of the wounds were inflicted prior to the victim's death. He said that she could have survived as little as several minutes or as long as an hour after the stab wounds were inflicted. Based on the blood spatters in the bedroom, and the pattern of blood flow on the victim's clothing and body, Dr. Smith opined that some of the wounds were inflicted while Wilson was conscious and in an upright position.

Testifying on behalf of the defendant was Dr. Chris Sperry, the Deputy Chief Medical Examiner for Fulton County, Georgia. Dr. Sperry reviewed the autopsy report and opined, contrary to Dr. Smith, that the initial blow to her head rendered Wilson unconscious. Dr. Sperry based this conclusion on the nature and severity of the head injuries and the lack of defensive wounds to Wilson's hands and arms. If the victim had been unconscious during the attack, Dr. Sperry said, she would not have felt the pain caused by the various wounds. When questioned on cross-examination, however, Dr. Sperry opined that Wilson had suffered "serious physical abuse beyond that necessary to produce death."

Through the testimony of his mother, the jury learned that Mann is the ninth child in a family of ten living children. Mann was placed in special education classes until he dropped out of school in ninth grade. Mann lived with his parents until he married, and according to his mother, Mann was helpful at home. The defendant's mother asked the jury to forgive her son and grant him a second chance. She said that she has given up three children in death and does not want to lose another.

The defendant's father testified that he has served as the pastor of the Original Church of Jesus Christ in Dyersburg for nineteen years. He said that Mann had been brought up in church. He apologized to the victim's family and asked the jury to spare Mann's life, saying that executing the defendant will not correct the wrong that has been done.

Finally, the defendant's wife of just over one year testified that Mann had been a kind and considerate husband. She made an emotional plea to the jury to spare her husband's life.

State v. Mann, 959 S.W.2d 508-509 (Tenn. 1997).

Based upon the proof, the jury found two statutory aggravating factors under Tennessee Code Annotated section 39-13-204(I):

(5) The murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death; [and]
(7) The murder was knowingly committed . . . while the defendant had a substantial role in committing . . . burglary.

-7-

The jury found the aggravating factors outweighed any mitigating factors and sentenced the petitioner to death. This Court affirmed the convictions and sentences on direct appeal, and our supreme court affirmed.[1]

## Post-Conviction

The petitioner sought post-conviction relief, contending the following:
(1) Ineffective assistance of counsel at the guilt stage of his trial;
(2) Ineffective assistance of counsel at the penalty stage of his trial; and
(3) The trial court's analysis of the facts and its application of the law were clearly erroneous.

During the post-conviction hearing, the petitioner called the following witnesses: trial co-counsel; Terry Wayne Sweat; lead counsel; Latonya Mann; John Herman Mann; Connie Westfall; Johnnie Mae Mann; William Redick; Dr. Frank Einstein; Dr. Dorothy Granberry; Dr. Murray Smith; Dr. Pamela Auble; and Dr. George Woods. Their testimony is summarized as follows:

**Trial co-counsel**, currently a city judge and juvenile referee for Dyer County, testified that in April 1994, he was appointed to assist lead counsel in the defense of the petitioner. Co-counsel said the trial was set to commence on May 31, 1994, and between the time of his appointment and the start of the trial, lead counsel consulted with him on several occasions. He said that lead counsel wanted to try to get the case settled on a life sentence without parole, and lead counsel felt that he might be influential in getting the petitioner to accept that. Co-counsel stated that lead counsel went on vacation for a few days during this time. Co-counsel further recalled meeting with the petitioner's family, with specific emphasis on settling the case prior to trial. He testified that he could not recall any discussions with lead counsel about mitigation theories at the sentencing phase nor the petitioner's psychological functioning. He said he could not say those discussions did not happen, but he could not recall them as they left no impression on him. Additionally, he said he could not recall any further details of his part in the petitioner's representation.

On cross-examination, co-counsel testified that the proof as to the guilt phase was overwhelming against the petitioner. Furthermore, he testified that he was aware of an outstanding offer by the State of a plea to a sentence of life without the possibility of parole and that he and lead counsel relayed the offer to the petitioner and his family, but the offer was met with resistance by the petitioner's brother, Eddie Joe Mann. Co-counsel said he then told the petitioner that, based on

---

[1] The following issues were raised on direct appeal: (1) Whether the evidence was sufficient to sustain a conviction for premeditated first degree murder; (2) Whether the trial court incorrectly instructed the jury regarding the laws of homicide; (3) Whether the appellant's trial counsel was afforded the appropriate time, assistance, and compensation; (4) Whether the appellant's statements were introduced against him in violation of his constitutional rights; (5) Whether the jury was properly selected; (6) Whether the trial court incorrectly instructed the jury regarding the jury's consideration of mitigation evidence; (7) Whether the death penalty unconstitutionally infringes upon the appellant's right to life; (8) Whether the prosecutor infringed upon the appellant's right to trial by offering a life sentence in return for a guilty plea; and (9) Whether the Tennessee death penalty statute is unconstitutional.

the facts of the case and the confession, he could "very easily" receive the death penalty. He said that his voir dire efforts were in hope of obtaining non-death penalty jurors, although he also said that he did not suggest to lead counsel to use jury questionnaires. Additionally, he testified that he was unaware of any defenses to the State's proposed aggravating factors.

On redirect, co-counsel testified that he did not investigate the source of the petitioner's brother's influence on the petitioner nor was he aware of the petitioner's IQ. He said he was uninvolved in any efforts to suppress the petitioner's statements. Co-counsel testified that he did not recall discussing with lead counsel the importance of developing mitigation evidence.

**Terry Wayne Sweat** was a criminal investigator for lead counsel who began work on the defendant's case in August of 1993. He testified that while he had "probably two years of college work, which included criminal justice courses . . .," he did not have any formal training nor did he have any psychological, social work, medicine, or psychiatry classes in college. Additionally, he testified that, prior to this case, he had not been involved in any capital murder case sentencing preparation.

Sweat recalled financial problems with regard to the funding of the investigation. He said the financial problems arose from lead counsel's fee paid by the Mann family. He said that, eventually, lead counsel filed for investigative services, but it was not until January 29, 1994, that he (Sweat) was approved. He testified that in an affidavit he prepared in April 1994, he indicated he had not yet completed the guilt phase investigation, "let alone started on the mitigation phase." Moreover, he testified to a May 13, 1994 affidavit where he said he had not started serious mitigation investigation.

Sweat added that on May 25, 1994, lead counsel received a list of twenty-one witnesses the State intended to call at trial, including seven police officers. He said that as of that date, he had interviewed three of the seven police officers. Furthermore, he testified that, at that time, he had someone else helping him interview outside witnesses and said, "I didn't interview any but the officers that I mentioned, and I know there was one or two other independents. But out of the others, I didn't interview them."[2]

Sweat further related that Gail Hedrick assisted in the defense's investigation. He said that Hedrick interviewed witnesses and gathered information despite having no formal training as an investigator. He said she was, in fact, a hairdresser who was taking criminal justice courses at the local college. Shortly after the petitioner's trial, he said that, to his knowledge, Hedrick failed to pursue a career in criminal justice and returned to hairdressing.

Sweat testified that lead counsel attempted to obtain the services of various experts. He said that Gillian Blair, a Nashville-based psychologist, was contacted by the defense team to evaluate the

---

[2] We have determined that what Sweat was testifying to was that out of the twenty-one total witnesses on the list, he interviewed three police officers and possibly one or two others.

petitioner. Sweat could not recall whether there was any effort to obtain a mitigation specialist. He said inquiries were made into other potential suspects leading to the conclusion that one suspect, Tim Armstrong, had a viable alibi.

Sweat testified that he made no effort to interview the petitioner's prior employers and, to his knowledge, no effort was made by any member of the defense team. He said neighbors, former teachers, and friends of the petitioner were interviewed. A review of the petitioner's school records led Mr. Sweat to notice that the petitioner had a learning disability. He said he discussed the petitioner's education with two people from the school system, although he did not look into what programs were available to the petitioner in the Dyersburg School System.[3] He again testified that little had been done in terms of developing the mitigation theories in this case.

On cross-examination, Sweat testified that while he had not worked on a sentencing phase of a capital case, he had worked on first degree murder cases.[4] He said that in preparation for this case, he met with William Redick, the director of the Capital Case Resource Center ("CCRC") at the time, and obtained some guidance and information, although he was unable to recall the specifics. He said he met with the petitioner's family members, namely his wife, mother, and brother, in an effort to obtain background information. He said that the petitioner's mother was cooperative, but that his brother, Eddie Joe Mann, was not. He said there were discussions with the petitioner and his family regarding a plea to life without parole, but that such a plea was opposed by Eddie Joe Mann. Additionally, Sweat said he was unable to gather any evidence which would show that the petitioner was not guilty of the murder. He further stated that he only deemed the information gathered from the petitioner's family, and not from neighbors or friends, useful for purposes of mitigation. He finished by saying that while he had never previously worked on mitigation before, he had direction from lead counsel, Redick, other members of the CCRC, and Gillian Blair in this case. He had also talked to neighbors and family members, had obtained school and medical records, and had done anything the above individuals instructed him to do.

On redirect examination, Sweat testified that if, when he was conducting his interviews and reviewing records, he had discovered the petitioner was involved in numerous fights, that "could very well have been . . ." helpful as mitigation. He said that no one compiled the obtained documents into anything resembling a time line or a social history of the petitioner.

---

[3] Sweat identified one of the school system workers as Ann Thompson, but referred to the other as "another lady at the board of education."

[4] Sweat's testimony to this effect is confusing. The following is how he responded to the question,"But had you worked on prior cases of first degree murder, as far as guilt phase of trials?" Sweat responded, "No sir, not that I recall, Mr. Bivens. And it seems like I did work on at least one or more first degree murder cases. And, of course, the guilt phase, you know, would have been, of course, my area. But I can't recall what any of the specifics may have been." We conclude that based on the details from Sweat's answer, he had worked on a first degree murder case concerning the guilt phase.

-10-

**The petitioner's lead counsel** testified that he had about twenty-four years of experience practicing law at the time of the trial. He said he originally told the client that he would charge $10,000 for a non-capital murder case and that he thought he was paid about $3200 or $3250, so that he was involved in the case and was not paid in full. Lead counsel testified that when he originally agreed to take the case, he did not think the State would request the death penalty. He said that Stafford Hagwood, another attorney who was first retained by the petitioner's family, had died in a car accident, so he (lead counsel) became involved in late July or early August of 1993. He said he received notice that the State would seek the death penalty when they filed their aggravating factors in October 1993.

Lead counsel testified that he was the senior partner in a law firm with three other lawyers and "probably a dozen" other workers when he was involved with this case. He said the overhead on the firm was about $30,000 to $35,000 per month. Additionally, he said that during that time, the firm lost "probably two" lawyers, which resulted in an increased caseload for him. He testified that the bulk of his practice involved "personal injury, workmen's comp, social security, criminal, and, at that time, domestic." Furthermore, he testified that he practiced in nine or ten different counties, in "General Sessions, City, Chancery, Circuit, Federal" courts, and had an active appellate practice.

Lead counsel testified that he filed a motion to become appointed counsel for the petitioner because the representation was causing difficulty for his firm. He said a fair fee for a privately retained lawyer for a case of this magnitude would be a "quarter of a million dollars." He said that his motion to be appointed counsel was denied because he was originally a retained lawyer and that if the court was going to appoint counsel, he or she would be from the public defender's office. He testified that, principally, he was the sole lawyer from his firm handling this case.

Lead counsel testified that he used Terry Sweat and Gail Hedrick as investigators. He said that to his knowledge, Hedrick had no prior criminal investigation experience. He said they would discuss what was needed using a form he obtained from the CCRC. He testified that he recalled Hedrick obtaining school, hospital, and health records, but did not remember whether she obtained the petitioner's juvenile records.

Lead counsel testified that the petitioner was initially examined to determine if he was "death qualified, IQ-wise." Additionally, he sought funds for a psychologist, Gillian Blair. He said the various examinations and records of the petitioner indicated that he suffered from a severe reading disability. He further testified that the results of an IQ test revealed that the petitioner had a verbal IQ of 75, a performance IQ of 92, and a full-scale IQ of 80. He said that prior tests had revealed a verbal IQ of 69, a performance IQ of 96, and a full-scale IQ of 81. He said it would be a fair statement to say that the petitioner would potentially have difficulty understanding the spoken language. Lead counsel testified that he did not believe the evidence was sufficient to convict the petitioner without the petitioner's confession. He stated that one of the issues presented at the suppression hearing was whether the petitioner had knowingly and voluntarily waived his right to remain silent before making his confession. Lead counsel said that Dr. Blair's report and the

-11-

psychological evidence it contained would have been useful at the suppression hearing in establishing whether the petitioner's confession was coerced. Notably, lead counsel later testified that he did not have "nothing to lose" by challenging the credibility of the petitioner's confession because he did not want to inflame the jury.

Lead counsel testified that he took a trip to Ireland before the trial, returning approximately one day before the trial started. He said that when he left for Ireland, he thought the case would be settled, but he "wasn't prepared to try this case at all. This case didn't need to be tried." He said that he was trying to convince the family to accept a plea to "ordinary life" in prison and that he asked Skip Gant, an African-American lawyer with the NAACP, to talk to the family because he thought the problems he was having convincing them to accept the plea was due to the "race thing." Lead counsel said there was a hearing before the trial judge on May 18, 1994, where he discussed that he was going to Ireland on May 20, 1994, and that due to the trip, he would not be prepared for a May 31, 1994 trial. He said that his being unprepared was due, in part, to his investigator's lack of mitigation experience.

Lead counsel said he sought funds for the use of a pathologist, Dr. Sperry, from Georgia. He said the trial judge would not authorize funds for Dr. Sperry because he wanted lead counsel to use the State's pathologist, Dr. O.C. Smith. Lead counsel said Dr. Smith is not a friend of the defense, and he did not think he would be helpful to their case. He said he was not convinced the case would settle at that point and, therefore, he was unprepared to proceed to any sentencing phase. He said he did not believe his investigator, Terry Sweat, had the proper experience to prepare a mitigation package. He explained that Sweat was preoccupied with other cases, when investigators with private investigation agencies such as Inquisitor, Inc., devote their full time and attention to mitigation. Moreover, he said those type of investigators have strong backgrounds in social sciences and psychology, unlike Sweat who merely followed a checklist prepared by the CCRC.

Lead counsel testified that in his dealings with co-counsel, they did not really have any substantive discussions about trial strategy, although the basic arrangement was that co-counsel would assist with voir dire. Concerning the investigation of prospective jurors, lead counsel testified that while they did not conduct specific questionnaire background checks of the prospects, they used some general knowledge and general questions in order to find out more about them, especially since they were in a small town. He said that basically, as late as May 30, 1994, both he and co-counsel were under the impression the petitioner would accept the plea bargain and that had they known he would not, there were other things they would have worked on. However, he said, most likely due to the interference of the petitioner's brother, Eddie Joe Mann, the petitioner changed his mind and did not accept the plea. He testified that they then requested more time to either try to convince the petitioner to take the plea or in order to do further preparation, but the request for more time was denied.

Lead counsel testified that based on what he knew five years after the trial, he would have further researched and developed the behavioral problems experienced by the petitioner. However, he said he did not think any requests he could have made for additional funding for investigation

would have been granted by the trial court. He further testified that there were a number of other areas which should have been more deeply investigated in terms of mitigation themes, including the petitioner's sexual problems, IQ problems, and failures in the school system. He said a mitigation specialist would have picked up on some of these themes which were missed in his investigation and mitigation preparation.

Lead counsel testified that, at the penalty phase of a capital case, counsel would want to include things such as the petitioner's split IQ, problems in school, and drug use. He said that while some of that answer was based on hindsight, it is possible that some of the evidence can be used for mitigation. He said co-counsel had not developed a theory of defense but it was not his job. He then said that "a theory of defense had not been developed in this case . . . ." Furthermore, lead counsel said, "You would want to have your theory of mitigation understood and done before the guilt-innocence phase . . . ." Lead counsel agreed that he "really seriously needed a mitigation specialist" which was not provided. He said that he requested a recess of five days when the penalty phase began because he had "a bunch of junk for mitigation." Although "[f]or whatever reason . . . " he was unprepared, much of that reason was the lack of a mitigation specialist. The recess was denied.

After the trial court denied the five-day recess, lead counsel said, "Well, I wouldn't say I immediately began to prepare. I had Dr. Blair subpoenaed here. I had Dr. Sperry here, and, of course, [the petitioner's] mother and father were here." He said he met with the family members the final time for less than thirty minutes, basically to get them on the stand and try to get some sympathy. He said the mitigation theory they presented to the jury "did not compare to what one of these mitigation specialist[s] can do. It was scant material." He said Dr. Sperry was called to negate the heinous, atrocious, and cruel aggravator. He said he did not remember if he got into the law with Sperry as much as his medical training testimony. He said Sperry was strong on direct examination in testifying that there was no torture because the victim was rendered unconscious. However, he said the district attorney did an incredible job on him during cross-examination such that Dr. Sperry essentially proved the aggravator rather than defended it. Lead counsel said he called his second witness, William Redick, of the CCRC, out of desperation, thinking that maybe he could testify to the money issues and hopefully persuade the jury that it would save money to avoid the death penalty. He said the other three witnesses were family members who did not present anything of substance.

Lead counsel again testified that nothing was developed about the petitioner's split IQ, special education classes, reading disabilities, drug and alcohol abuse, or sexual deviancy, because there was no proof.

On cross-examination, lead counsel testified that while he had tried one prior capital case, he was aware of the American Bar Association guidelines for representation and was qualified. He said he did everything in his power on this case, even though he was not paid. He said that co-counsel was probably the most experienced murder case trial lawyer in the country. Lead counsel said he was aware of the requirements for mitigation proof. He said he spent 111 and 3/4 hours on the case since he was retained and spent $730 out-of-pocket expenses on death penalty seminars and

-13-

books. He said he attended a death penalty seminar sponsored by the Tennessee Association of Criminal Defense Lawyers ("TACDL") and sought their assistance, as well as made numerous contacts with the CCRC and its director, William Redick, whom lead counsel described as "experienced as anybody he knew." He contacted Dr. Blair through TACDL. He said he discussed mitigation proof with Redick. He said the CCRC had the names of many resources such as psychiatrists, sociologists, etc.

Lead counsel testified he had knowledge that the petitioner, had he taken the stand, would have perjured himself. Based on that knowledge, he said that he tried to withdraw from the case at one point. He said a letter he received from Dr. Blair, whom he employed for the purpose of helping with mitigation, indicated that she would be of no help to his case.[5] As a result, lead counsel said he did not ultimately call Dr. Blair to testify. He further testified that he made a request for funds for a mitigation specialist, but the request was denied. He said that if he knew then what he knew now, he would have refused to go to trial without a mitigation specialist and would have exhausted all appeals to try and get the trial court reversed on that issue.[6] Additionally, he said he would have involved TACDL and the National Association of Criminal Defense Lawyers. He said that he did not want to go to trial but had to show up, and that he was unaware of any mitigation proof available to him that he did not put on.

On redirect-examination, lead counsel testified that Dr. Blair was a clinical psychologist, not a neuro-psychiatrist and was, therefore, not a mitigation specialist. He said he did not ask for additional funds for additional experts because he felt the court would not have granted them. Nonetheless, he agreed it would have been beneficial to ask for funds for a neuro-psychiatrist. He said there was no additional proof presented at trial about what a mitigation specialist would have found. He said that a social history of the petitioner was prepared but was "piecemeal." He said none of the evidence concerning the petitioner's actual IQ or an interpretation of what that evidence meant was presented to the jury. He said the underfunding of the case did not affect him (lead counsel), but did affect the tools he had to work with. Additionally, lead counsel said he had a fairly high case load at the time of this case and had limited time to put into this case. Additionally, he said he was seeking funds for a neuropharmocologist who would testify about the impact of the petitioner's drug and alcohol abuse.

On recross-examination, lead counsel testified that he asked for funds for investigation services, namely for a psychologist. He did get funding for his investigator, Terry Sweat, whom the court said could do the mitigation investigation, funding for Dr. Blair, and funding for a forensic pathologist, Dr. Sperry. Lead counsel said he relied heavily upon the advice of the CCRC, which never recommended that he seek a neuro-psychologist.

---

[5] The letter written from Dr. Blair to lead counsel stated in pertinent part, "Given the benign psychological profile and the lack of any substantive mitigating evidence, I'm not sure that I will be of any use to you in your case."

[6] On direct appeal, this Court determined that the trial court did not err in denying the petitioner funds for a mitigation expert. See State v. Mann, 959 S.W.2d 503 (Tenn. 1997).

-14-

**Latonya Mann**, the petitioner's wife, testified that her husband is close and very involved with her seven children, though he is not the father of any of them. She said she married the petitioner shortly before he was arrested in this matter. Ms. Mann stated that she was not contacted by lead counsel regarding the charges against her husband until the trial had already commenced. She said that when she was asked to testify, she was at the courthouse to show support for her husband. She said this request made her "upset and nervous" because she was unprepared since they came to her "at the last minute." On cross-examination, Ms. Mann admitted that, prior to trial, she knew that lead counsel represented her husband even though she did not know his name. She also could not recall a statement given on November 10, 1993, to Gail Hedrick. When confronted with the statement, Ms. Mann admitted that "people came to see me," and they may have talked to her prior to trial, but that was "awhile ago" and they "hadn't talked to me no more since."

**John Herman Mann,** the petitioner's father, testified that he and his wife married when they were eighteen and are the parents of thirteen children. He said his wife, himself, and their oldest children supported the family by "working in the fields," "chopping cotton, picking strawberries," along with other various jobs. Mr. Mann further explained that he has been the pastor at the Ridgely Church of Jesus Christ for the past twenty-three years. He testified that the petitioner was "mindful" as a child and good at home, but started having problems when he got to high school. He said he did not remember whether the school recommended to them that the petitioner get counseling. He said his son got into some trouble stealing tapes out of cars and ended up spending time at the Spencer Youth Center.[7] He said he did not remember ever being called to come to any treatment programs in Nashville nor did he remember meeting with a probation officer.[8]

John Mann testified that they originally hired Stafford Hagwood to defend his son, but after Hagwood's death, they hired lead counsel for a fee of $10,000, of which they paid $3200. He said they never paid any more than $3200. He said he remembered that on one occasion, he, his wife, and his son, Eddie Joe, met with lead counsel. William Redick was also present at that meeting. He said he played a tape of the petitioner's confession and then told them it would be a good idea if they settled the case. He further said that he felt a good attorney would not tell someone to admit to something even if they did it. He said that the next time he was asked to testify in the case, his son had already been found guilty, that he (John) did not really know what was going on, and that they just wanted counsel to plead for his son's life. He said that lead counsel gave him no idea what he was to testify about and never came to him to ask him to testify, even though he never refused to do so.

On cross-examination, John Mann testified that he was unaware of the problems with his son growing up because his "wife took care of that more than I could." He said his son, Eddie Joe, hired Stafford Hagwood, whom he had never heard of. He said he had heard of lead counsel and co-counsel. He said that he paid lead counsel only $3200 of the $10,000 fee because it was all he could

---

[7] Spencer is a juvenile detention facility.

[8] This reference to Nashville is referring to the Spencer Youth Development Center.

-15-

afford at the time and that lead counsel never told him he would not represent his son if he did not pay him any more. He said that after they played the tape of his son's confession, both lead counsel and co-counsel said that, based on the available proof, they thought it was the best decision to plead guilty in this case rather than take a chance with the death penalty. He said he could not persuade his son to take the plea so the attorneys sent an African-American lawyer with the NAACP to persuade him to do so.

On redirect-examination, John Mann testified that before the attorneys tried to get them to take the plea, there were no other talks about things that could have been done in defense of the case. Mann further said that lead counsel should have done everything possible to defend the petitioner, including calling other witnesses in his defense. On re-cross examination, he said the petitioner told lead counsel the names of witnesses, but he (John) never gave him the names of other witnesses.

**Connie Westfall**, an investigator with the Post-Conviction Defender's Office assigned to the petitioner's case, testified that she generated a report compiled from mitigation information collected in this case. In compiling the document, Ms. Westfall said she interviewed approximately 98 people. She testified she met with the petitioner over 30 times and with his parents over 20 times, ultimately gaining their trust. It was explained to her that the petitioner's attorneys were having problems communicating with the petitioner. She said she made numerous contacts with the petitioner's family in order to gain their trust. She said that in the beginning, race can certainly be a factor in gaining trust, but that it can be overcome.[9] She said she spoke with the petitioner's brother, Eddie Joe, probably ten or twelve times and also had phone conversations with him. She said that after a few visits, the family realized she was there to help the petitioner so they began to give her information. She said that, in conducting her interviews, she went to numerous prisons and other towns in Tennessee, as well as traveling to Milwaukee, Toledo, and Seattle. Additionally, she said she created a time line and a social history of the petitioner, which included information from his family, his schooling, his work record, his juvenile records, his prison records, and his medical and mental health information.

On cross-examination, Ms. Westfall said she never prepared mitigation information for a sentencing hearing, only for post-conviction proceedings, after a client was found guilty.

**Johnnie Mae Mann**, the petitioner's mother, testified in the form of a deposition due to a recent leg amputation. Mrs. Mann said that she was the mother of thirteen children, including the petitioner, and that ten of her children are still alive. She said the petitioner was "a lot more playful" than the rest of her children. She said he was "sweet," and "he was smart, and he was a neat child." As a child, the petitioner had spinal meningitis and suffered from hives and frequent nosebleeds. She said the petitioner was a good student until he reached high school, where he had problems due to fighting with other students. She testified that she was not aware that her son was placed in special classes. Moreover, she said that she could not remember whether anyone from the school was trying to help the petitioner with his problems. She said she was unaware of any attempts at

---

[9] The petitioner and his family are African-American. Lead counsel and Ms. Westfall are white.

getting counseling or any other program for him. She said that while he was at Spencer, she could not recall anyone from that facility working with or having meetings with her son. Additionally, she said the petitioner was friends with some neighborhood children, and the petitioner and these children would get "in trouble."

In testifying about the instant charges, Mrs. Mann testified that she met with lead counsel at his office, although she could not recall when the meeting occurred. She said that during this meeting, they discussed her son's case and the "money they had to have." She said they also discussed plans to have him declared indigent. Mrs. Mann recalled a second meeting, although she could not recall what was discussed, as well as a meeting during the trial when they discussed the possibility of Mrs. Mann testifying. At this last meeting, Mrs. Mann stated that lead counsel advised her to testify regarding what "kind of person [the petitioner] was." She said that was the first time anyone talked to her about testifying. Although Mrs. Mann testified on her son's behalf, she said she "didn't feel good sitting up there" because she was uncomfortable "in front of lawyers and judges." She said she did not remember any contact with lead counsel between those two meetings.

On cross-examination, Mrs. Mann testified that the petitioner had been in trouble when he was a juvenile, including a rape charge. She said that, if she was not mistaken, she and the attorneys talked about trying to get her son to take a plea in this case. She said the attorneys explained to her about the possibility of the death penalty if there was no plea, but she told her son that "if he did not do it he should not say that he did."

On redirect-examination, Mrs. Mann testified that she read in the newspaper about the financial difficulties lead counsel was having as a result of this trial, but he never discussed that with her. On recross-examination, she said she did not call lead counsel after reading the newspaper article. Furthermore, she said counsel never threatened to discontinue the work due to money. She said she did not know of anything her husband or her son asked counsel to do that he did not do.

**William Redick**, former director of the Capital Case Resource Center for Tennessee, testified that the CCRC operated as a clearinghouse for all death row representation in Tennessee from September 1988 to September 1995. Redick said his office was contacted by trial counsel in this matter. He said during this initial contact, it was determined that lead counsel was having problems gaining the trust of the Mann family and that this lack of trust was determined to be as a result of lead counsel being white and the Manns being African-American. He said that due to this communication problem, the CCRC had Skip Gant, an African-American attorney employed by the CCRC, meet with the Manns to communicate with them regarding the offered plea. However, Redick only recalled one meeting between Gant and the Mann family, and he said that other than race, Gant had nothing in common with the Mann family. He described Gant as a "dapper . . . big city lawyer."

Redick said that, based on his experience in capital cases compared to non-capital cases, an attorney must know his client because his life is on trial. In this regard, he said that "an unusual

amount of time [must] be spent with the client and his family, that a great deal of investment be made in that relationship."

In the instant case, Mr. Redick testified to having some telephone conversations with trial counsel and eventually meeting with them in person. He said they discussed the petitioner's confession and the possibility of a plea. Because of the confession and the strength of the State's case, they determined it was "imperative" that defense counsel anticipate a sentencing hearing. He said that due to the strength of the State's case, the strategy was to get the petitioner to settle the case, but regardless, any capital defense counsel should perform a life history investigation. He said that such an investigation involves getting every piece of paper from every institution that has any reference to their client. He said an attorney would also need to spend a lot of time with both the family and the petitioner, identifying people that he came in contact with during his life that may have some insight, or may have something to say that could be relevant at a sentencing hearing. Redick acknowledged that this case was "way under financed." Furthermore, he said the process of preparing for a sentencing hearing is "a very work intensive, time consuming, resource consuming project . . ." He said the more that lead counsel understood about all these background materials, the better his chances would be to find a way to settle the case, improving his chances of articulating defenses at both the guilt and the sentencing phases.

Redick testified it was apparent, as a layperson, that the petitioner was a person with limitations and that those limitations needed to be identified and evaluated. He said those limitations affected both the circumstances surrounding his confession and his ability to voluntarily waive any rights he had in making the statement. He said the petitioner needed the benefit of the best psychological evaluation available and the jury needed to understand the petitioner's mentality in terms of weighing the significance of his statement. He said lead counsel was not prepared for the April 8, 1994, suppression hearing and should have put on more proof concerning the circumstances of the confession. In fact, he testified that lead counsel did not even obtain a psychological report on the petitioner until after the suppression hearing (May 27, 1994), making it impossible for lead counsel to have been prepared.

Redick further testified that the petitioner was very easily manipulated, as exemplified by his family's ability to persuade him not to enter a guilty plea. He added that any evidence regarding the petitioner's impairments would go against the element of premeditation and should have been introduced at the guilt phase. Specifically, he said that the "mentality of [the petitioner]" should have been addressed during opening statement; "it certainly should have been addressed to the jurors." He said the petitioner had organic brain damage which would have affected his ability to control his impulses and that evidence would have been useful for a jury to help determine the petitioner's culpability level. He said he would have presented more psychiatric or psychological proof.

Testifying about voir dire, Redick was informed that lead counsel stated they did not need voir dire preparation because they were relying on co-counsel's experience and knowledge. Redick said that capital cases do not consist of a "cookie cutter voir dire" and that they should have done

-18-

some voir dire preparation before the trial. Additionally, Redick said they should have known what the theory of defense was prior to trial.

Regarding the penalty phase of the trial, Redick said:

. . . what counsel should have done is, they should have put on the story of his life through witnesses that knew his life, and documents that reflected that witnesses could refer to, and then relied upon the experts to make sense out of that for the jurors. . . . what you're trying to do is to show what the causes, what the influences were on Mr. Mann's life that led him to the place where he could be involved in this offense, forces that he didn't have any control over. . . .

He said the opening statement of co-counsel "made no mention of the facts of the case. He didn't make any mention of [the petitioner]. The only thing he referred to was the jury's obligation to determine aggravating and mitigating circumstances, and weigh them, and reach a verdict." Redick said the lack of an opening statement and the lack of a mitigation case reflected a lack of preparation. Additionally, Redick said that the mitigation evidence presented in this case was "totally inadequate." He said there was no information presented to the jury about the petitioner. He said the jury heard from the petitioner's wife, mother, and father, but they said very little about the petitioner. Notably, he testified his wife stated that she did not want her husband to die; his mother stated that he helped her around the house; and his father related nothing of any substance. There was no mention of the petitioner's mental impairments or mental state.

Redick said they should have prepared the jury for the proof they would hear about the petitioner's life and the things which influenced him into committing a less than volitional act. He said they should have presented evidence of the petitioner's impairments and limitations, as well as evidence of the his good characteristics.

Redick testified that the whole impetus of the case was to settle because (1) they did not want to go to trial with a death-qualified jury with "this proof," and (2) they were unprepared. He testified that prior to lead counsel's trip to Ireland, he asked the court for a continuance, which was denied. He said that once again he tried to continue the case prior to the start of the penalty phase and was denied. Redick then said he observed lead counsel "prepare his sentencing hearing from scratch" in about thirty minutes and also said lead counsel was "at a complete loss as to what to do at sentencing." He said it was obvious that neither the petitioner's father, mother, or wife had been prepared to testify.

Redick said that when he testified for the petitioner at the penalty phase, he discussed the cost of implementing the death penalty, the rationale being that the jury might reconsider giving a death sentence if they realized it would consume more State resources trying to execute the petitioner than putting him in prison for life. However, he said testimony had nothing to do with the petitioner himself. Redick further said that, while lead counsel was an experienced attorney, "he didn't really know how to get ready for a capital trial, and he didn't really know how to make a complete record.

He didn't know how to persuade the Judge of his needs . . . . " He said that while lead counsel was trying to obtain a mitigation specialist, he did not present the evidence it might take in order to convince the judge of the need for the specialist. He said lead counsel operated under the belief that this case would settle and would not be tried. Redick said lead counsel did not grasp the concept of what needed to be done. He said that although he felt lead counsel was genuine in his discussions with the CCRC, because lead counsel thought the case would settle, he approached the trial date without getting ready for trial. Additionally, he said that based on his experience, lead counsel did not have the type of relationship necessary in his dealings with experts, including Dr. Blair, who Redick said was disappointed about the lack of communication she had with lead counsel.

On cross-examination, Redick testified that he was contacted very early in this case. He said he agreed with lead counsel that, based on the petitioner's confession, a realistic approach to the case was to try to convince their client that he needed to accept a life sentence rather than proceed to trial. He said he observed what trial counsel was doing and felt it was inadequate. He said he discussed funding for investigators for the guilt phase and sentencing with trial counsel and, to his knowledge, they did not follow his recommendations but went forward even though they were unprepared for trial. While he could not recall exactly what was discussed, Redick said he discussed a number of potential experts with trial counsel and that one reason for that was to try and find facts in order to settle this case. He said they were unable to get the petitioner to settle, primarily because of the influence of his brother, Eddie Joe Mann.

Redick further testified that in an effort to convince the petitioner to plead, they had Mr. Gant, an African-American attorney with his office, try to persuade the petitioner to accept the plea to life. Additionally, Redick said that an attorney with the NAACP was also contacted to advise the petitioner's family that he needed to accept the plea. However, Redick blamed the failure to accept the plea on lead counsel's failure to build trust with the petitioner's family. Further, he felt that lead counsel should have done more to improve his relationship with the petitioner's family in order to establish the necessary trust.

Redick said his job at the CCRC was to ensure that all capital defendants were adequately represented. He said he did "whatever we could, and whatever [lead counsel] wanted" in this matter, but this was not "a close case" as lead counsel "provided no representation for [petitioner] at sentencing." Moreover, although Redick stated that his office advised lead counsel as to things needing to be done in this matter, lead counsel did not do them and Redick's office did not step in to ensure that necessary preparation was completed. He said there were a number of things lead counsel should have done, regardless of funding. He said that if the need is great, counsel can obtain the needed resources, such as securing mitigation experts.

Redick testified that he handled the petitioner's appeal. He said he challenged the trial court's denial of funding for expert services but did not raise any challenges to the effectiveness of trial counsel on direct appeal due to the record being incomplete.

**Dr. Frank Einstein**, a self-employed sentencing consultant and mitigation specialist, testified to the role mitigation specialists play in a capital case. He said the concept is to convey the human elements of a defendant to a jury at the sentencing hearing, making use of available resources such as: social history, family interviews, school records, social service records, institutional

records, documentary evidence, and all other available information.  He said there was a consensus in the legal profession that mitigation specialty was a necessity.

Dr. Einstein said that "almost nothing was done in this case" in terms of mitigation.  He stated that he would expect to see "some interview memos" and "documents which had been collected and also some review of what the significance of the life history documents is."  Rather than finding any form of analysis or social history of the petitioner in lead counsel's file, Dr. Einstein said he discovered a "series of a xeroxed checklist which was taken from the Ultimate Trial manual about things that should be looked for in mitigation."  He said no social history was done.  Additionally, he said that some trial attorneys are not qualified to perform this mitigation analysis.

Dr. Einstein said that there was relevant information in the file, such as of the petitioner's school records.  Specifically, there was important information, including individualized educational program reports which consisted of psychological evaluations pointing out the petitioner's split IQ and learning disability.  Additionally, there was information that the petitioner had been in "resource classes" and that he had been retained in both the first and the sixth grades.  Dr. Einstein said that these were "red flags" that needed to be looked at further.  Furthermore, he said some other things which should have been investigated included the petitioner's "history of adjustment problems, *i.e.,* fighting both in and outside of school, and the fact that his problems started so early."  He said that in addition to the potential significance of the educational records, other areas which should have been looked into in preparation were:  the IQ split, the data from the educational records, the petitioner's adjustment problems, the lack of counseling community dynamics, sex problems, and race relations.

Another area of adjustment problems is the fact that the petitioner had been charged with three different rapes, although he was found not guilty of two. He said this should have been a red flag to lead counsel that perhaps an expert in sexual offenses should have been contacted.  Finally, Dr. Einstein stated that the "community dynamics" should have been explored, *i.e.*, the historical situation of African-Americans in rural West Tennessee.  He said this was an important factor in understanding the petitioner's rejection of a plea offer.

Dr. Einstein further testified that the three mitigation witnesses, *i.e.*, the petitioner's parents and wife, should have testified about the petitioner's "background and his family background a couple of generations back."  Their testimony should have included the fact that both parents worked and that the petitioner's father was rarely home because he worked two jobs.  Additionally, it should have been noted that because both parents worked, the eldest brother, Eddie Joe, took over the father's role and "sometimes was very punitive with the children when the parents were not at home."

Dr. Einstein testified that the petitioner's impairment could be diagramed in three basic areas: (1) his low average, borderline intellectual functioning, (2) his substance abuse, and (3) his neurological impairment.  Regarding the petitioner's substance abuse, Dr. Einstein said he would have recommended the employment of an "addictionologist."  Moreover, Dr. Einstein said he would have explored that due to the petitioner's "severely comprised" mental functioning and decision making abilities, school was difficult for the petitioner and an unhappy experience, and as a result, the petitioner sought success in other areas, *i.e.,* the street.  He fell into a peer group by whom he was

easily influenced, thereby leading him to alcohol and drug use and, on some level, drug-dealing and early arrests.

On cross-examination, Dr. Einstein said that the rape, beating, stabbing, and eventual murder of an elderly woman who had befriended the petitioner were the petitioner's fault, but that he had a lack of resources available to help him make constructive decisions. He said lead counsel should have prepared the three mitigation witnesses more carefully and should have elicited more information from other available witnesses. Questioned about the relevance of the petitioner's prior rapes, Dr. Einstein said they were relevant but were results of the same lack of resources as previously mentioned.

Dr. Einstein further testified that it would normally take about 250 to 350 hours to prepare mitigation for a capital case. He said he was paid in excess of $14,000 in this case, and his fee did not include conducting interviews. In this regard, Dr. Einstein said a key factor in completing a sufficient mitigation history would be the funding available to the attorney. He added that, as most attorneys are unable to analyze mitigation information, a mitigation expert would be essential.

**Dr. Dorothy Granberry**, a social psychologist, testified that she had concentrated a large part of her research the last twelve years on developing a socio-psychological perspective of African-American communities in West Tennessee. She said that as a result of her research, she was able to conclude, *inter alia*, that the agrarian past of the rural West Tennessee African-Americans carries over to the urban existence and that sociological changes do not necessarily occur rapidly. Additionally, she testified that there was other research available concerning this issue. She said that in 1993-1994, there was information available to assist someone who was having trouble communicating with African-Americans.

In the present case, Dr. Granberry testified that she was asked to look at the petitioner and his family and to look at how race may have played a role in what transpired during his trial. She said that in doing so, she interviewed the petitioner and his family, reviewed available reports, reviewed issues of the local newspaper, and interviewed other people in the area. She concluded that "there was a gap in communication" and that such gap was caused by a failure, based on the historical factors, of the petitioner to understand the system. She said that intervention was needed to bring the operating systems of the parties involved together. She said they were still having to deal with a legacy of oppression of African-Americans and that, specifically, Haywood and Fayette counties were probably two of the most oppressive places in the country, which would lead to disenfranchisement and suspicion among the African-Americans.[10]

In order to address these problems in communication, Dr. Granberry said there needs to be an awareness that there is a problem. She said she recommended that a cultural translator help cross the cultural differences and that in 1993-1994, there was such a person (a cultural translator) available in West Tennessee, a history professor at the University of Memphis who was formerly at Rhodes College. She was unable to remember his name.

---

[10] The petitioner's parents were reared in Haywood County.

On cross-examination, Dr. Granberry testified that she had only a vague notion of what a mitigation specialist was. Additionally, she said that she was unaware if the aforementioned University of Memphis professor had ever actually testified in a trial. Moreover, she said that in 1993, nobody knew her.

Dr. Granberry said that getting the assistance of an African-American attorney and making contact with the NAACP could be considered a legitimate attempt to break down a communication barrier. On redirect, she said that if this attempt failed, it would be possible to turn to persons in the community.

**Dr. Murray Smith**, a medical doctor specializing in alcohol and drug addiction,[11] stated that he was contacted by the Office of the Post-Conviction Defender to work on the petitioner's case. He said he was supplied records of evaluations completed by psychologists, arrest records, and basic background information. Additionally, Dr. Smith said he interviewed the petitioner, specifically to discuss his life history and the effects his lifestyle had upon him. He said that "[a]bsolutely," substance abuse played a role in the petitioner's life prior to the offenses, stating that the petitioner began drinking at about age fifteen and started using cocaine and marijuana at the age of eighteen. He said this became the petitioner's lifestyle, and he spent most of his time and energy on getting and using drugs.

Dr. Smith said that the effect of the early use of alcohol is that it arrests a person's emotional development and his or her ability to grow into appropriate adult behavior. Moreover, he said that alcohol makes a person impulsive and impairs judgment so that person's perceptions of what is happening and how he or she should respond is altered, and the addition of cocaine and marijuana would serve to exacerbate the effects already demonstrated by the alcohol use. He said a consistent predictor of this abuse was children who had a sense of insecurity or inferiority, a feeling that they were defective. He said that alcohol reduces the level of fear and cocaine gives the feeling of power, thus changing the way the user feels.

Dr. Smith testified that the petitioner was using alcohol and drugs on the night the victim was killed. He said the petitioner's habit was to use alcohol and marijuana all day and then stay up all night snorting cocaine. He said the petitioner lived in a perpetual haze. Dr. Smith concluded that the petitioner's substance abuse played a role in the offenses and in his encounter with law enforcement. Specifically, he said the petitioner was "actively intoxicated" during the encounter with the victim and was beginning to go into withdrawal during his confession to police. He said that alcohol withdrawal "makes you irritable, sweaty, high blood pressure, high pulse, wanting to just get it over with so they'll leave you alone, so that he tends to say whatever he needs to say to stop the relationship."

On cross-examination, Dr. Smith testified that his information regarding the petitioner's drug and alcohol use came solely from information provided by the petitioner himself and not from any independent research. Additionally, he said that even if intoxicated, the petitioner would still have been able to think clearly enough to know that he had committed a crime, and it would not affect his

---

[11] Known as "addictionology."

ability to take other actions, such as establishing an alibi or hiding. He said the petitioner would have known that he was raping and killing the victim.

**Dr. Pamela Auble**, a clinical neuropsychologist, testified that she evaluates the effect a brain injury might have on a person. She said her evaluations stand on three legs: (1) interviews with the client and/or persons in the client's life, (2) standardized testing, and (3) a review of relevant information about the client. Dr. Auble said that in evaluating this petitioner and reviewing data given to her by Dr. Blair, she reached different conclusions than Dr. Blair did in 1993.[12] She said the differences were the result of her having access to more information and having more contact with the petitioner.

Dr. Auble said that she found two items of significance in terms of directing various testing for brain impairment or neurological damage: (1) school records indicating a discrepancy between his verbal functioning and nonverbal functioning and (2) social information from interviews indicating that the petitioner's development as a child was not normal. She said the petitioner did not have a plan for his life, did not have insight into what he is like as a person, and did not cope well with complexity. She said she did not think the petitioner understood what was going on around him. Regarding her results as to the petitioner's language impairments, Dr. Auble stated:

> The language impairments are manifested in several different ways. On the IQ testing, . . . he shows a big difference between his language based skills and his non-verbal skills. He's also had a lot of trouble, and he had a lot of trouble in school learning to read and academic achievement. He was diagnosed with a learning disability. He also shows difficulty being able to come up with words when he wants the words.

She further testified that on the Boston Naming Test, most persons score 55 out of 60 correct, and that 99 percent of the population scores over 50. The petitioner, however, scored 45 out of 60, which she said is way below the first percentile. On the Wexler Memory Scale, Third Edition, she said the petitioner scored significantly lower than is expected for someone with his intelligence. In determining any frontal lobe damage, Dr. Auble said she administered the Wisconsin Card Sort and the Booklet Category Test. She said the petitioner showed considerable impairment on the Wisconsin Card Sort, scoring in the second to third percentile. Additionally, she said the petitioner had difficulty with the Booklet Category Test, scoring in the sixth percentile. Dr. Auble said that she discounted malingering as the petitioner's results were similar to those past test scores and the results showed the same patterns.[13]

Dr. Auble concluded that the petitioner had three areas of problems: (1) memory, (2) language and verbal skills, and (3) frontal lobe functioning or mental flexibility. Additionally, she said it appears that the petitioner was suffering from a life-long deficit in terms of the above problems and that his substance abuse made things somewhat worse.

---

[12] Lead counsel testified that Dr. Blair told him she could be of no help.

[13] "Malingering," for the purposes of Dr. Auble's testimony, means the subject is purposefully getting poor results.

**Dr. George Woods**, a neuropsychiatrist, testified that he interviewed the petitioner, reviewed his social histories, reviewed his school records, reviewed his medical records and other prior family history, reviewed records from the Spencer Youth Center, reviewed Dr. Smith's report on addictionology, reviewed Dr. Granberry's report, and reviewed Dr. Auble's report. He said that neuropsychological testing, such as performed by Dr. Auble, is considered by the American Academy of Neurology to be the gold standard of determining brain function. Based on his evaluation, Dr. Woods concluded that the petitioner has "neurological deficits that have psychiatric manifestations. Psychiatric manifestations are basically behaviors that derive, but he has clear impairments in two different areas."

As to those deficits, Dr. Woods said that first, due to impairments in his brain, specifically the temporal lobe, the petitioner is often unable to be effective academically. He said the petitioner has a poor ability to read and has difficulty with language. Second, due to impairments to his frontal lobe, his executive function is impaired, his ability to think through a problem, his ability to weigh and deliberate his behavior. He said that all the tools were available to determine these frontal lobe problems and that there was a clear indication that something was wrong, but no steps were taken to determine what those problems might be. He said the school records, the disinhibition, the lack of ability to control behaviors as early as the first grade, and the petitioner's inabilities in school were all pieces of information consistent with the kind of impairments they see. He said that knowing the social history was important, as there was interplay between the social history and the testing factors.

Dr. Woods said that in terms of the petitioner's isolation, his impairments played directly into his involvement with the Westside Posse. He said this group would accept the petitioner without requiring the kind of academic, intellectual, or environmental success that might require him to do other things. He said the petitioner's inability to solve problems "dovetailed" into his fighting. Additionally, he said that the petitioner's parents failed to recognize him as a special needs child.

Dr. Woods further testified that race was an issue in this case and that the problem could have been better addressed if more had been known about the petitioner. He said the lobe impairments played a part in the petitioner being overborne. As to the crime itself, he said the petitioner's ability to weigh and deliberate was impaired and he was unable to conform his behavior. He said the mental impairments to the petitioner were not insignificant. Dr. Woods said that the impairments would not have had an impact on the petitioner when he made the choice to steal the television, but that once the unexpected happened, the petitioner's decisions would be affected. He said the impairments made the petitioner more susceptible to pressure, such that he would not necessarily be able to make a decision in his best interests, for instance, taking the plea offer instead of going to trial. He said he had an absolute certainty that the frontal lobe problems caused psychological problems in the petitioner.

Regarding mitigating factors, Dr. Woods testified that there was proof to support a finding that the petitioner was substantially impaired as the result of mental defect or disease and that the petitioner was under the influence of extreme mental or emotional disturbance.

On cross-examination, Dr. Woods said that a trial lawyer may not have been aware of all of these types of problems but that there are tremendous amounts of resources for them. He said he would not expect an attorney to be able to read a report from someone like himself or Dr. Auble and

-25-

pick up on the clues that there was a problem. However, Dr. Woods said that the attorney should ask further questions and be more thorough, even if he did not understand the information at first. On redirect examination, Dr. Woods said that lead counsel was aware of the problem the petitioner had with his split IQ, and that he would then expect an attorney to investigate further. Dr. Woods further stated that when Dr. Blair indicated she needed more material, that should have been a clue to get more material or have a more qualified psychologist, like Dr. Auble, review that information.

## Post-Conviction Court Conclusions

The petitioner contends that he received ineffective assistance counsel. The post-conviction court found that the petitioner argued the following points as proof of trial counsel providing ineffective assistance of counsel:

(1) The underfinancing of the defense;
(2) Excessive workload of counsel;
(3) Unqualified investigators used by counsel;
(4) Insufficient investigation;
(5) Failure to utilize co-counsel and failure to prepare for trial; and
(6) Failure to effectively utilize expert services.

Prior to addressing the specific claims of the petitioner, the post-conviction court observed the following: The attorneys are two of the most experienced criminal trial attorneys in the Twenty-ninth Judicial District. Lead counsel has represented more criminal defendants than any other attorney in the area, except for co-counsel. Both attorneys have defended both murder cases and death penalty cases. Lead counsel originally agreed to take the case for $10,000 as a non-capital case. He was paid $3200. He used Terry Sweat and Gail Hedrick as investigators, and neither had any death penalty experience. Sweat, however, had been conducting criminal investigations for many years and was very experienced in the area.

**(1) Underfinancing of the defense:** The post-conviction court found that the petitioner retained counsel on August 24, 1993, and that the trial was continued from November 30, 1993, to May 3, 1994, when the trial court granted the petitioner's motion declaring him indigent, but denied counsel's motion for compensation, stating that it was under a duty to appoint a public defender before appointing or compensating private counsel. At that time, there was neither a motion for the appointment of a public defender nor a motion for the withdrawal of private counsel. On January 27, 1994, the trial court denied the petitioner's motion for a jury statistician and a mitigation specialist. The trial court noted that the investigator already appointed could perform the same work as a mitigation specialist and authorized $3000 for investigators Sweat and Hedrick, and another $3000 for Dr. Blair's psychological services. Additionally, on April 8, 1994, the trial court granted another $1500 for Terry Sweat and $3000 on May 27, 1994, for an expert pathologist, Dr. Kris Sperry. The trial court denied further motions for continuances on May 13, May 18, and May 31, 1994.

The post-conviction court concluded that the issue of underfinancing was determined on the petitioner's direct appeal and is therefore not the proper subject for a post-conviction proceeding. Significantly, the post-conviction court added that even if it did consider the issue, it could not find

ineffective assistance of counsel because it found that trial counsel did everything he could do to seek additional funding for the investigation, mitigation, and the employment of expert witnesses. The post-conviction court concluded the petitioner failed to carry his burden on this issue.

**(2) Excessive workload of counsel:** The post-conviction court found there was no evidence that lead counsel's situation in his law firm kept him from spending the necessary time on the case needed to avoid a conviction. The post-conviction court further found there was no evidence in the record that anything could have been done to avoid a conviction, as there was the petitioner's confession and no valid defense available other than from a sentencing standpoint. The post-conviction court concluded that the petitioner failed to show by clear and convincing evidence that lead counsel was deficient due to an excessive caseload or that there was any prejudice.

**(3) Unqualified investigators used by counsel:** The post-conviction court found there was no evidence that the investigators were unqualified on the issue of guilt or innocence as this argument would only be applicable to sentencing. The court found no evidence in the record to substantiate any claims of ineffective assistance of counsel for having unqualified investigators. The court found there was evidence that the investigators had no experience in death penalty cases involving mitigation. The court also found that the petitioner failed to prove with any additional evidence that the outcome of the sentencing phase would have been different, and therefore, consequently, no prejudice was shown by the use of any unqualified investigators.

**(4) Insufficient investigation:** The post-conviction court found that the local District Attorney General had an open file policy and that the file, along with the statements of the officers and the investigation of the case, were available to the petitioner's attorneys and investigators. The court found that there was "simply no evidence" to suggest an insufficient investigation as a basis for an ineffective assistance of counsel claim nor any evidence to suggest prejudice in terms of guilt or innocence. Additionally, the court found that issue previously determined on direct appeal.

In connection with the sentencing phase of the trial, the court found that there was no real mitigation investigation. The court found that counsel had available to him at trial the immediate members of the petitioner's family, Mr. Redick, Dr. Sperry, and Dr. Blair. The court found that as part of trial strategy, trial counsel chose not to use Dr. Blair because she indicated she would hurt their case. The court found that Dr. Sperry was used to challenge an aggravating factor, but helped to prove an aggravator on cross-examination. The court concluded that the issue of insufficient investigation for the sentencing phase was previously determined on direct appeal. Additionally, the court determined that the petitioner failed to prove by clear and convincing evidence that he was prejudiced in connection with this issue and that evidence that additional mitigation investigation would have caused a different result in sentencing is insufficient for the petitioner to carry his burden of proof.

**(5) Failure to utilize co-counsel and failure to prepare for trial:** The post-conviction court found there were distractions and circumstances that the trial attorneys did not spend as much time in preparation as they wanted. The court found that part of the problem was that the petitioner told his attorneys he would accept a guilty plea and then later changed his mind. The court also found that the attorneys asked for continuances on several occasions and were denied and that the issue of whether the denial of the continuances was proper was previously determined.

The post-conviction court found there was no evidence in the record to suggest that any further preparation would have created a difference in the guilt phase of the trial. Additionally, the court found there was no evidence in the record to suggest that, due to the petitioner's organic brain problem, his confession would have been suppressed. The court found no prejudice proven by clear and convincing evidence. The court found no evidence that failure to utilize co-counsel was deficient nor did it find any prejudice.

As to the sentencing phase, the post-conviction court found there "certainly were" some failures by counsel to properly prepare. Specifically, the court found the failures involved the investigation and preparation of mitigation evidence and the hiring of a neuropsychologist and neuropsychiatrist. However, the court found that these issues were previously determined on direct appeal and that, consequently, there was no showing of deficient performance in this area and with the aggravating factors that were considered by the jury, there was a failure by the petitioner to prove by clear and convincing evidence that there was any prejudice.

**(6) Failure to effectively utilize expert services:** The post-conviction court again found that this issue was previously determined on direct appeal. The trial court record reflected the efforts of trial counsel to obtain an investigator for mitigation services and for expert services. The post-conviction court gave trial counsel the services which were available under the law in 1994. Moreover, the post-conviction court found that expert evidence from Dr. Dorothy Granberry, a social psychologist; Dr. Murray Smith, an addictionologist; Dr. Pamela Auble, a neuropsychologist; and Dr. George Woods, a neuropsychiatrist, would have had little, if any, effect on the guilt phase of the trial but could have certainly had some effect during the sentencing phase.

Specifically, the post-conviction court found that Dr. Granberry would have been used to show that the petitioner had trouble trusting his attorneys and that in order to gain this trust, more time needed to be spent with the family discussing the case. The court found, however, that the petitioner's brother, Eddie Joe Mann, had more influence on him than the attorneys, so any additional efforts by the attorneys would have been useless.

Dr. Auble and Dr. Woods would have indicated that the petitioner had an organic brain problem which affected his ability to make "executive decisions," especially when he was under stress. Additionally, the court found that Dr. Smith would have indicated that the petitioner's alcohol use would have had essentially the same effect. The court found that trial counsel was unaware of those experts at the time of trial although he was in contact with the CCRC, who had knowledge of such experts. However, the post-conviction court found that the failure to obtain some of the above information precluded trial counsel from furnishing enough information to raise those particular issues on direct appeal. The court found that with all of the additional information, trial counsel would have certainly been able to present a more complete picture of the petitioner to the jury, a picture of a man troubled since childhood by neurological impairments that created a sense of frustration due to his lack of verbal skills. However, the post-conviction court found that the issue of the effectiveness of trial counsels' utilization of expert witnesses was determined previously on direct appeal.

The court also found there was no prejudice during the sentencing phase. The court determined that it is not enough for the petitioner to show that any errors by trial counsel had a

conceivable effect on the outcome of the trial. The burden on the petitioner was to show that any errors showed a reasonable probability that, but for those errors, the result would have been different. A reasonable probability means the confidence in the outcome of the trial was undermined. The court concluded that the petitioner failed to meet his burden in establishing that by clear and convincing evidence and, accordingly, denied post-conviction relief.

## Analysis

### Post-Conviction Standard of Review

The petition challenging the petitioner's conviction for premeditated first degree murder is governed by the 1995 Post-Conviction Act, which requires that allegations be proven by clear and convincing evidence. See Tenn. Code Ann. § 40-30-210(f). Findings of fact and conclusions of law made by the post-conviction court are given the weight of a jury verdict, and this Court is bound by those findings unless the evidence contained in the record preponderates otherwise. Nichols v. State, 90 S.W.3d 576, 586 (Tenn. 2002); Davis v. State, 912 S.W.2d 689, 697 (Tenn. 1995). This Court may not reweigh or reevaluate the evidence or substitute its inferences for those drawn by the post-conviction court. Nichols, 90 S.W.3d at 586. Finally, questions concerning the credibility of witnesses and the weight to be given their testimony are for resolution by the post-conviction court. Nichols, 90 S.W.3d at 586 (citing Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997)). Notwithstanding, when reviewing legal issues or a mixed question of law and fact such as an ineffective assistance of counsel claim, the appellate court's review is *de novo* with no presumption of correctness. Nichols, 90 S.W.3d at 586 (citing State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999)).

### Ineffective Assistance of Counsel

For a petitioner to have his conviction overturned based on ineffective assistance of counsel, the petitioner must first establish that the services rendered or the advice given was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). Second, the petitioner must show that the deficiencies "actually had an adverse effect on the defense." Strickland v. Washington, 466 U.S. 668, 693, 104 S. Ct. 2052, 2067, 80 L. Ed. 2d 674 (1984). The petitioner is not entitled to relief should he fail to establish either factor. Our supreme court described the standard of review as follows:

> Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the petitioner makes an insufficient showing of one component.

Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996) (citing Strickland, 466 U.S. at 697, 104 S. Ct. at 2069). The petitioner is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy, and may not criticize a sound, but unsuccessful, tactical decision made after adequate preparation for the case. Adkins v. State, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994); see Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

To prove a deficiency in counsel's performance, a petitioner must show that counsel's acts or omissions were so serious that they fell below an objective standard of reasonableness under prevailing professional norms. Strickland, 466 U.S. at 688, 104 S. Ct. at 2064; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). As our supreme court has observed:

> "The assistance of counsel required under the Sixth Amendment is counsel reasonably likely to render and rendering reasonably effective assistance. It is a violation of this standard for defense counsel to deprive a criminal defendant of a substantial defense by his own ineffectiveness or incompetence . . . . Defense counsel must perform at least as well as a lawyer with ordinary training and skill in the criminal law and must conscientiously protect his client's interests, undeflected by conflicting considerations . . . ."

Id. at 934-35 (quoting Beasley v. United States, 491 F.2d 687, 696 (6th Cir. 1974) (citations omitted)). In reviewing counsel's conduct, a "fair assessment . . . requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689, 104 S. Ct. at 2065.

The petitioner contends he was denied the right to effective assistance of counsel in two areas: (1) the guilt stage and (2) the sentencing phase.

## I. Ineffective Assistance of Counsel at the Guilt Stage

The petitioner claims he was denied effective assistance of counsel, specifically, by trial counsel's failure to meet the following standards:

(1) Trial counsel accepted this potential death penalty case despite the recent departure of two attorneys from his firm and while representing another capital client, Marshall Edwards. Thereby, trial counsel failed to maintain his workload at an acceptable level.
(2) Trial counsel's representation of the petitioner was impacted by financial constraints.
(3) Trial counsel failed to develop a relationship with the petitioner.
(4) Trial counsel failed to conduct a proper investigation, including the failure to identify, locate, and interview all relevant witnesses.
(5) Trial counsel failed to develop a defense theory of the case.
(6) Trial counsel failed to adequately argue the motion to suppress.
(7) Trial counsel was totally unprepared to defend the petitioner against a capital murder charge.

We conclude that the petitioner did not receive ineffective assistance of counsel at the guilt stage of the trial.

**(1) Trial Counsel accepted this potential death penalty case despite the recent departure of two attorneys from his firm and while representing another capital client, Marshall**

-30-

**Edwards. Thereby, trial counsel failed to maintain his workload at an acceptable level.** The post-conviction court found that there was no evidence that lead counsel's situation in his law firm kept him from spending the necessary time on the case. The post-conviction court further found there was no evidence in the record that there was anything that could have been done to avoid a conviction as there was the petitioner's confession and no valid defense available other than from a sentencing standpoint. The post-conviction court concluded that the petitioner failed to show by clear and convincing evidence that lead counsel was deficient due to an excessive caseload nor that there was any prejudice. We agree. After our own exhaustive review of the record, we cannot conclude that the record preponderates against the post-conviction court's finding that trial counsel's caseload rendered him ineffective in his representation of the petitioner. The petitioner failed to present any evidence as to the relationship between trial counsel's caseload, including his representation of another capital case client, and trial counsel's representation of the petitioner. We need not address the issue of whether trial counsel actually did have a burdensome caseload because the petitioner failed to provide the link between that and any detrimental representation.

The petitioner seems to suggest that a practicing attorney is compromised in his ability to properly provide effective assistance of counsel if he is representing more than one capital case client. This allegation stands bare as the petitioner presented a lack of proof that his trial counsel's caseload prevented him from properly representing the petitioner in this case.

**(2) Trial Counsel's representation of the petitioner was impacted by financial constraints.** There are two aspects to this claim: (1) that the trial counsel had inadequate funding to handle this case, and (2) that due to not being paid in full, trial counsel's efforts were compromised. As to the first, the post-conviction court found that trial counsel did everything possible to seek additional funding for investigation. Moreover, the post-conviction court found that the issue of financial restraints on the trial counsel was determined on direct appeal and, therefore, not a proper subject for post-conviction review. We agree. This claim is without merit.

Regarding the second aspect, that not being paid in full compromised trial counsel's efforts, we view the petitioner's claim on this issue to involve a claim that because trial counsel was not paid as the petitioner or his family agreed to, trial counsel was "impacted by financial constraints," such as to render him ineffective. It is true that trial counsel was not paid as promised by the petitioner or his family. Indeed, trial counsel received less than a third of the promised fee. Nonetheless, no evidence exists to prove that this fact impacted trial counsel's performance. Quite to the contrary, the record is clear that in the face of receiving very little compensation from the petitioner and his family, trial counsel went to great lengths in providing pro bono service to the petitioner.

**(3) Trial Counsel failed to develop a relationship with the petitioner.** The petitioner avers that most of trial counsel's efforts were spent attempting to convince the petitioner to plead guilty and accept a sentence of life without the possibility of parole. In this respect, he asserts that trial counsel was also deficient in that he failed to establish a relationship with the petitioner and his family, failed to recognize the petitioner's limited verbal understanding, and was oblivious to the Mann family's distrust of white authority figures. The petitioner contends that trial counsel was ineffective for failing to develop a relationship with the petitioner, such relationship being necessary in order to help convince the petitioner that it was in his best interest to accept the plea instead of going to trial. We cannot agree.

The post-conviction court found that the petitioner's brother, Eddie Joe Mann, had more influence on him than the attorneys, so any additional efforts by the attorneys would have been useless. As relating to whether trial counsel was ineffective at the guilt phase of the trial, even if he failed to develop a meaningful relationship with the petitioner, that in itself would not render his actions ineffective. The right to counsel is guaranteed by the United States Constitution, but that right does not include "the right to a meaningful attorney-client relationship." See Morris v. Slappy, 461 U.S. 1, 13 (1983). The Supreme Court additionally stated that "[n]o court could possibly guarantee that a defendant will develop this kind of rapport with his attorney." Id. We conclude that based on the presenting information of the petitioner's confession to the police, whether trial counsel developed a meaningful relationship with the petitioner would have had no impact on how trial counsel prepared for the guilt phase of this trial. Accordingly, we conclude this issue is without merit.

**(4) Trial counsel failed to conduct a proper investigation, including the failure to identify, locate, and interview all relevant witnesses.** The post-conviction court found there was no evidence to support a claim that an improper investigation led to ineffectiveness of counsel. We agree. Additionally, our review of the record reflects that trial counsel had the assistance of Terry Sweat, an investigator for over twenty years, working on this case. The petitioner stresses the fact that, in addition to Sweat, another investigator, Gail Hedrick, had very little experience. However, when determining whether there was ineffective assistance of counsel, the actions of counsel are given broad deference. As such, the use of Terry Sweat as an investigator was not ineffective. Moreover, the most incriminating piece of evidence on this case was the petitioner's confession. It is a reasonable inference that trial counsel conducted his investigations accordingly.

The State is correct in pointing out that a criminal defense attorney "must conduct appropriate investigations, both factual and legal, to determine what matters of defense can be developed." Baxter v. Rose, 523 S.W.2d 930, 933 (Tenn. 1975). In other words, there is an affirmative duty to investigate. However, "'counsel has the duty to make reasonable investigations *or to make a reasonable decision that makes particular investigations unnecessary.*'" Nichols v. State, 90 S.W.3d 576, 587 (Tenn. 2002) (emphasis added) (quoting Strickland, 466 U.S. at 691, 104 S.Ct. at 2052). Furthermore, while a petitioner's statements do not eliminate a counsel's duty to investigate, the reasonableness of that counsel's actions "may be determined or substantially influenced by the defendant's own statements or actions." Id. In the instant case, the evidence against the petitioner was overwhelming and the petitioner indicated that he was going to accept the State's plea offer. As relating to the guilt phase preparation of the trial, being faced with these facts, we conclude the reasonableness of their actions was within the range of competence for trial preparation. Investigations still proceeded, and trial counsel attempted to gain more time before trial to prepare further. We conclude there is no merit to this issue.

**(5) Trial Counsel failed to develop a defense theory of the case.** The post-conviction court addressed this issue in the context of trial counsel's preparation and found there was no evidence in the record to suggest that any further preparation by the defense would have affected the outcome of the guilt or innocence phase of the trial. Our review of the record reveals the petitioner produced no evidence to show that "failure to develop a theory" of the case was related to any possible ineffectiveness by trial counsel. This argument is bootstrapped by petitioner's similar

argument that trial counsel did not conduct an adequate investigation and, therefore, failed to develop a theory of the case. We conclude this issue is without merit.

**(6) Trial counsel failed to adequately argue the motion to suppress.** The petitioner contends trial counsel erred in failing to introduce evidence of the petitioner's split IQ, substance abuse, and social history in advancing the argument that his confession was involuntary. The post-conviction court found that this evidence would have had little or no effect on the guilt or innocence phase of the trial. Expert witness Dr. Gillian Blair determined that evidence of the split IQ was insignificant. Trial counsel's decision not to pursue this angle was reasonable based on his reliance upon Dr. Blair's recommendation, especially as it related to any motion to suppress. Additionally, there was a lack of evidence as to whether the petitioner was intoxicated at the time of the murder and whether the petitioner's social upbringing would have had any impact on the motion to suppress is speculative at best, further making trial counsel's decision not to pursue this not deficient. We conclude the petitioner has failed to present evidence to preponderate that the manner in which trial counsel handled the motion to suppress the petitioner's confession was deficient. Accordingly, we conclude this issue is without merit.

**(7) Trial counsel was totally unprepared to defend the petitioner against a capital murder charge.** By his own admission, trial counsel was unprepared concerning a number of aspects in this case, most notably, in his preparation for the sentencing phase. However, as his preparedness applies to the guilt phase in this case, we simply cannot conclude that based on the information that trial counsel had and based on the information that trial counsel received directly from the petitioner, that any unpreparedness on his part reached the level of ineffective assistance of counsel. The post-conviction court found that there was no evidence in the record that further preparation would have affected the outcome of the trial. The primary aspect that the petitioner argues was ineffective was trial counsel's attempts and failures to get him to accept the plea offer from the State. A review of the record reveals that this strategic decision by trial counsel was not unreasonable nor a basis for an ineffective assistance of counsel claim.

Notably, the petitioner informed trial counsel that he was going to accept a plea to life imprisonment in order to avoid the possibility of receiving the death penalty. The petitioner's witness, William Redick with the CCRC, testified it was in his best interest to accept the plea. Trial counsel's actions in this aspect were reasonable.

Furthermore, the petitioner argues that trial counsel "assumed there was no affirmative defense available to [the petitioner]" and that the assumption was not the result of a reasoned strategic decision. We disagree. As discussed above and as the evidence throughout the record leads us to believe, the most reasoned choice in this case was to get the petitioner to accept the plea. In the light of the overwhelming evidence against the petitioner, his confession, and the clearly established death penalty aggravating factors, the decision by trial counsel to make strong efforts to get the petitioner to accept a plea that would save his life was a reasonable one.

We cannot determine that the evidence presented by the petitioner preponderates against the post-conviction court's findings that trial counsel was not ineffective. Accordingly, we conclude the entire issue that trial counsel was ineffective at the guilt phase of this trial is without merit.

## II. Ineffective Assistance of Counsel at the Sentencing Phase

When a petitioner challenges a death sentence based on ineffective assistance of counsel in the penalty phase, he or she must show that "there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Strickland, 466 U.S. at 695, 104 S. Ct. at 2069. Where the alleged prejudice involves counsel's failure to present sufficient mitigating evidence, several factors are of significance: (1) the nature and extent of the mitigating evidence that was available, but not presented; (2) whether substantially similar mitigating evidence was presented to the jury in either the guilt or penalty phase of the proceedings; and (3) whether there was such strong evidence of aggravating factors that the mitigating evidence would not have affected the jury's determination. Goad v. State, 938 S.W.2d at 371.

The petitioner contends that trial counsel did not undertake their duty to identify and gather the necessary mitigation documents, records, and physical evidence. He asserts that trial counsel "failed utterly to develop and pursue a comprehensive mitigation theory for [petitioner's] sentencing trial." Rather, he asserts counsel "worked out of 'desperation,'" spending a "half an hour 'preparing' his sentencing witnesses." Specifically, the petitioner asserts the following as evidence of counsels' ineffectiveness at the sentencing phase: (1) trial counsel failed to consult with expert witnesses prior to their testimony; and (2) trial counsel presented merely cosmetic lay witness testimony. The post-conviction court's findings on these issues are set out verbatim later in the analysis section of this opinion.

### Analysis

**(1) Counsel failed to consult with expert witnesses prior to their testimony.** The petitioner argues that trial counsel was deficient by presenting only five witnesses at the sentencing hearing, and not properly consulting with one of those witnesses, Dr. Sperry. Dr. Sperry was called to challenge one of the State's aggravating factors, *i.e.*, that the murder constituted physical injury beyond that necessary to cause death. Dr. Sperry's testimony, however, actually assisted the State in proving this aggravator. The petitioner asserts that the failure to prepare Dr. Sperry resulted in this witness becoming a witness for the State and, hence, the defense assisted the State in meeting its burden of proof regarding this aggravating factor. The petitioner relies upon the Combs v. Coyle, 205 F.3d 269, 288 (6th Cir. 2000), cert. denied, 531 U.S. 1035, 121 S. Ct. 623 (2000), in support of this claim. In Combs, the Sixth Circuit Court of Appeals found counsel ineffective for failure to consult with experts prior to trial and learn of adverse testimony the expert would present. During the guilt phase in Combs, the expert testified that the defendant was intoxicated, but nonetheless was still able to act with the requisite mens rea required for the Ohio crime. The failure to discuss the possibility of that admission was determined ineffective assistance of counsel because that was during the guilt stage and the admission about the mens rea negated the *sole defense theory*. In the instant case, even if on cross-examination Dr. Sperry admitted to a fact that essentially proved an aggravator, his testimony also added to the defense of another aggravator. Any lack of preparation in the instant case was far less damaging and not prejudicial, than in Combs.

At the sentencing hearing, Dr. Sperry testified that the victim was unconscious after the initial blows to the head and did not suffer extensive physical pain when the petitioner raped and stabbed

her. Dr. Sperry further said that the victim was unable to feel pain once she was rendered unconscious, and therefore, being unable to feel pain, she was not tortured. However, Dr. Sperry admitted on cross-examination that he believed that the victim suffered serious physical abuse beyond that necessary to cause death. Trial counsel presented Dr. Sperry to call into question the State's proof that the victim was conscious at the time the injuries were inflicted. While, indeed, Dr. Sperry's testimony on direct examination called into doubt the State's proof that the murder involved torture, trial counsel could not have prevented Dr. Sperry from stating that he believed the victim suffered serious physical abuse beyond that necessary to cause death. He said that the district attorney did an "incredible job" during cross-examination of Dr. Sperry and that led to Sperry essentially proving the aggravator rather than defending against it. Although the potential for such a statement could have been discussed prior to trial, the decision to present Dr. Sperry's testimony refuting the issue of the victim's consciousness nonetheless remains one of trial strategy. The petitioner presents no clear and convincing evidence to convince this Court that the overall decision and preparation of Dr. Sperry was not a strategic decision.

Furthermore, defense counsel could not have advised Dr. Sperry to falsify his opinion. Finally, the petitioner has failed to show that further preparation of this witness or that absent the testimony of this witness would have affected the jury's determination that a sentence of death was warranted. This claim is without merit.

The petitioner also contends that the use of the other expert witness, William Redick, with the CCRC, was questionable as mitigation evidence and clearly had nothing to do with the petitioner himself. Redick testified that it was more costly to execute someone than to keep him in prison for life. The petitioner presents nothing but a bare bones argument that Redick's testimony was without merit. We see nothing to counter the presentation of Redick as being a strategic choice by trial counsel in an attempt to find leniency in sentencing. This issue is without merit.

**(2) Counsel presented merely cosmetic lay witness testimony.** The petitioner contends that trial counsel were ineffective for failing to identify, locate, and interview all relevant mitigation witnesses. He asserts that the testimony of the three final witnesses, his father, mother, and wife, were merely "short pleas to spare the life of their loved one." He reinforces his position by trial counsel's and Sweat's acknowledgment that they were not prepared for trial. Additionally, he points to the failure of trial counsel to make any significant preparations for the sentencing phase until after the conclusion of the guilt phase. The jury heard little, if any, information about the petitioner's history, character, background, and psychological profile.

Specifically, the petitioner argues that the following evidence should have been presented in mitigation:

(1) The petitioner suffers from organic brain damage, and this brain damage influences his conduct;
(2) The petitioner's upbringing, specifically his parents' dearth of physical and emotional resources;
(3) The petitioner's learning disability and the frustration and behavioral troubles it has generated; and
(4) The petitioner's tendency to follow rather than lead.

While not necessarily agreeing with the specific evidence the petitioner argues should have been presented, we acknowledge more could have been done on behalf of the petitioner. Trial counsel was more limited in financial resources to obtain experts at trial than was post-conviction counsel. However, as we will discuss throughout the analysis, we nonetheless conclude that even if trial counsel had acted ineffectively, we cannot say there is a *reasonable probability* that the result of sentencing would have a different outcome. In other words, we cannot conclude that the confidence in the outcome of this sentence was undermined. In making this determination, where the prejudice involves a trial counsel's failure to present sufficient mitigating evidence, we turn to Goad v. State, 938 S.W.2d 363 (Tenn. 1996).

**Analysis and the application of the Goad factors:** Where the alleged prejudice involves counsel's failure to present sufficient mitigating evidence, several factors are of significance: (1) the nature and extent of the mitigating evidence that was available but not presented; (2) whether substantially similar mitigating evidence was presented to the jury in either the guilt or penalty phase of the proceedings; and (3) whether there was such strong evidence of aggravating factors that the mitigating evidence would not have affected the jury's determination. Goad v. State, 938 S.W.2d at 371.

**Sentencing hearing evidence presented:** Trial counsel presented five witnesses at the sentencing hearing: Dr. Sperry, William Redick, the petitioner's wife, mother, and father. Essentially, the latter three pled for the petitioner's life. Dr. Sperry was presented to rebut one of the State aggravators and while he did testify that the victim was rendered unconscious during the murder and therefore unable to be tortured, he also admitted on cross-examination that the victim was beaten beyond that necessary to cause death, which is an aggravating factor. William Redick testified that it is less costly to imprison a man for life than to put him to death.

We analyze the trial counsel's mitigation effort at the sentencing hearing under Strickland's performance and prejudice components. Bell v. Cone, 535 U.S. 685, 697-98 (2002) (holding that failure to adduce mitigating evidence at sentencing in capital case was "of the same ilk as other specific attorney errors and therefore subject to Strickland); Burger v. Kemp, 483 U.S. 776, 788 (1987) (failure to put any mitigation evidence at capital sentencing analyzed under Strickland); Darden v. Wainwright, 477 U.S. 168, 184 (1986) (counsel's decision not to put on mitigation evidence at capital sentencing hearing analyzed under Strickland). The petitioner contends in his brief that we should analyze this claim under United States v. Cronic's presumption of ineffectiveness exception to Strickland. See 466 U.S. 648, 654 (1986). The petitioner asserts that trial counsel failed to "subject the prosecution's case to meaningful adversarial testing." See Id. In Bell, the United States Supreme Court made it clear that for the Cronic exception to apply, "the attorney's failure must be complete." 535 U.S. at 697. As in Bell, the petitioner's argument in this case is "not that his counsel failed to oppose the prosecution throughout the sentencing proceeding as a whole, but that his counsel failed to do so at specific points." Id. Therefore, Cronic is not applicable to this issue.

The petitioner complains that defense counsel was ineffective for failing to identify, locate, and interview all relevant mitigation witnesses. He also asserts that the testimony of the three final witnesses, his father, mother, and wife were merely "short pleas to spare the life of their loved one."

-36-

He reinforces his position by Mr. Kelly's and Mr. Sweat's acknowledgment that they were not prepared for trial. In support of his position, the petitioner cites to the failure of defense counsel to make any significant preparations for the sentencing phase until after the conclusion of the guilt phase. The jury heard little, if any, information about the petitioner's history, character, background, and psychological profile.

Indeed, the petitioner argues that the following evidence should have been presented in mitigation:

(1) The petitioner suffers from organic brain damage, and this brain damage influences his conduct;
(2) The petitioner's upbringing, specifically his parents' dearth of physical and emotional resources;
(3) The petitioner's learning disability and the frustration and behavioral troubles it has generated; and
(4) The petitioner's tendency to follow rather than lead.

In preparing for trial, lead counsel obtained the assistance of the Capital Case Resource Center in identifying and developing mitigation proof. Lead counsel was assisted by his investigator, Terry Sweat, and Gail Hedrick in obtaining mitigation proof and interviewing the petitioner's family and friends. The trial court approved funding for Terry Sweat, a psychologist, Gillian Blair, and Dr. Kris Sperry, a forensic pathologist. Other requests for additional funding were denied by the trial court. See State v. Mann, 959 S.W.2d 503, 526-27 (Tenn. 1997).

Terry Sweat testified that many of the petitioner's relatives and friends were unwilling to talk to either him or Ms. Hedrick. The defense team obtained the medical and school records of the petitioner and forwarded the records to Dr. Gillian Blair for expert evaluation. Based upon this evidence, in a letter to counsel dated May 27, 1994, Dr. Blair reached the following conclusions:

. . . Glenn Mann described his childhood as good, and denied any abuse. . . .

Developmental history was apparently non-significant. Medical records indicated bronchopneumonia as an infant, and appendicitis at age eleven. Records revealed hospitalization at age 16 for viral meningitis. Recovery was apparently good, with no residual problems. At 19 years of age, he was treated for a chest injury, and alcohol use was noted at that time. Family history was negative for mental health problems/treatment, and Mr. Mann denied any prior mental health problems or treatment for himself.

Educationally Mr. Mann has a ninth grade education. He repeated sixth grade, but apparently had received resource services since at least fourth grade. Psychological testing dated 9/11/86 indicated low average intellect, with a significant weakness observed in the verbal domain. Academic achievement test data indicated the presence of a specific learning disability in reading. Mr. Mann said that he was expelled from school for discipline problems. . . .

Mr. Mann described significant abuse of alcohol from age 17, and at age 20 he began to abuse drugs including cocaine. Mr. Mann acknowledged a number of arrests, and has served time for burglary and theft of an automobile.

. . .

Mr. Mann was interviewed and tested at the North West Correctional Facility in Lake County. . . . There was no evidence of psychosis or delusional process. Mood was neutral and affect was full range. Intellect was judged to be borderline at least. Insight and judgment were impaired.

Current test data revealed low average intellectual functioning, with a significant discrepancy (> 16 points) between the verbal and performance domains . . . .

Mr. Mann demonstrated some difficulty sequencing and tracking complex information. . . .

Self-report measures suggested significant depression and mild anxiety. . . .The depressive symptoms were similarly situational in nature, and appeared exaggerated, since Mr. Mann did not present as clinically depressed.

Objective test data similarly suggested symptom exaggeration, and a questionably valid MMPI-2 profile. Mr. Mann endorsed an unlikely constellation of symptoms that were not supported by either interview or behavioral observations. Mr. Mann's enduring personality traits are consistent with an individual who harbors feelings of hostility, anger and resentment. . . .

In summary, Mr. Mann functions within the low average range intellectually. The presence of a language-based learning disability was indicated, and was consistent with prior test data. There was no evidence to suggest organicity. Mr. Mann evidenced a tendency to exaggerate symptoms. There was no suggestion of psychosis. Situational depression and anxiety were present. Personality test data suggested underlying resentment in a man who has difficulty generating and sustaining close interpersonal relationships. He does not learn from experience, and evidenced poor judgment and minimal insight. Mr. Mann described behavior consistent with substance abuse/dependency.

. . .

Based upon her conclusions, Dr. Blair informed defense counsel that: "Apparently there is nothing that might be helpful to me, should you require me to testify at sentencing. . . . Given the benign psychological profile, and the lack of any substantive mitigating evidence, I am not sure that I will be of any use to your case." This letter from Dr. Blair evidences that counsel was aware of the petitioner's learning disability, his psychological traits, and Dr. Blair's conclusion that the petitioner did not suffer from organic brain damage. Dr. Blair opined that her conclusions would not be helpful in mitigation.

Thus, Dr. Blair did discover and negate the findings that the petitioner now asserts should have been presented as mitigating evidence. Specifically, Dr. Blair found as not worthy of

-38-

introduction (1) the split between the verbal and performance IQ, (2) the petitioner's substance abuse, and (3) the petitioner's learning disability. It was reasonable for defense counsel to rely upon Dr. Blair's expert conclusions.

The petitioner's parents testified as to the petitioner's social upbringing in rural West Tennessee. The fact that counsel did not seek the academic studies of Dorothy Granberry or other scholars regarding African-American communities in rural West Tennessee does not result in a finding that counsel was therefore deficient. Additionally, Granberry's study was largely completed after the petitioner's trial and was, therefore, unavailable at the time.

Finally, the petitioner has failed to establish that the undiscovered mitigating evidence would have affected the jury's determination that a sentence of death was warranted. The proof as to the two aggravators was overwhelming. It is pure conjecture as to whether proof as to the petitioner's substance abuse would have assisted in mitigation.

### III.     The trial court erred in ruling that petitioner's post-conviction claims were waived or previously determined.

The petitioner contends that the post-conviction court erred in ruling that certain claims were previously determined or waived, specifically, the following: (1) underfinancing of the defense, (2) the qualifications of investigator Terry Sweat and student Gail Hedrick, (3) the sufficiency of the investigation, (4) trial counsel's failure to present mitigation evidence; and (5) trial counsel's failure to use expert services effectively.

Tennessee Code Annotated section 40-30-203, Grounds for Post-conviction Relief, states: "Relief under this part shall be granted when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." This Court previously held that "[p]reviously determined grounds for relief are not subject to review by post-conviction proceedings." Roach v. Moore, 550 S.W.2d 256, 260 (Tenn. Crim. App. 1977). "A ground for relief is previously determined if a court of competent jurisdiction has ruled on the merits after a full and fair hearing. A full and fair hearing has occurred where the petitioner is afforded the opportunity to call witnesses and otherwise present evidence, regardless of whether the petitioner actually introduced any evidence." Tenn. Code Ann. § 40-30-206(h). Accordingly, we need to determine whether a court of competent jurisdiction determined these issues after a full and fair hearing.

(1) Underfinancing of the defense: The post-conviction court found:

> Petitioner's first issue of underfinancing of the defense has previously been determined on direct appeal and is not the proper subject for post-conviction proceedings. It is significant to note, however, that if the Post-Conviction Court considered this particular issue, the Court could still not find any ineffective assistance of counsel as counsel did everything that he could do to seek additional funding for the defense for both investigation, mitigation and employment of expert

witnesses. Petitioner has failed to carry his burden of proof of ineffective assistance of counsel or prejudice on this issue.

On direct appeal, this Court and the Tennessee Supreme Court addressed the issue of the trial court's failure to fund additional experts. State v. Glen Bernard Mann, No. 02C01-9502-CC-00046, 1996 Tenn. Crim. App. LEXIS 508 at *50-54 (Tenn. Crim. App., at Jackson, Aug.16, 1996), State v. Mann, 959 S.W.2d 503, 527 (Tenn. 1997). The courts held that the petitioner was not prejudiced by the denial of additional funding. Id. Although the post-conviction court stated that this issue had been previously determined, the post-conviction court went on to consider the issue under Strickland. The post-conviction court held that the petitioner had "failed to carry his burden of proof of ineffective assistance of counsel or prejudice on this issue." We hold that the issue of underfinancing was considered by the post-conviction court, and we agree with its determination that the petitioner has not shown prejudice on this issue.

(2) Qualifications of the investigators, Terry Sweat and Gail Hedrick: The post-conviction court found:

> Again, there is no evidence that the investigators were unqualified in regard to the issue of guilt or innocence. This argument appears to be applicable only in the sentencing phase. It again should be noted that [trial counsel] requested from the trial court additional investigation and expert funding. This issue was again raised on direct appeal to the Court of Criminal Appeals and the Supreme Court. On appeal, the Court of Criminal Appeals and the Supreme Court noted that investigative services of Terry Sweat and Gail Hedrick were authorized along with funding of these services. Then the Court noted that the constitution did not require the appointment of either a jury statistician or mitigation specialist in this case and that these investigators already appointed could perform the mitigation work. Again, this issue is previously determined on direct appeal and not the proper subject for post-conviction proceedings. The Court also notes that there is no evidence in the record to substantiate any claim for ineffective assistance of counsel for having unqualified investigators as far as the guilt or innocence phase is concerned. There is evidence in the record that trial counsel's investigators had no experience in investigating death penalty cases regarding mitigation. Trial counsel acknowledges this lack of experience in the post-conviction evidentiary hearing. Trial counsel, however, applied to the trial court for more funding as mentioned above and his request was denied. The Court in summarizing the facts in this case also sets out what additional evidence would have been available to the jury during the sentencing phase. The Court finds that petitioner failed to prove with this additional evidence that the outcome of the sentencing phase would have been different. Consequently, no prejudice has been shown by the petitioner to this issue of "unqualified investigators."

The Tennessee Supreme Court held that the investigator assigned to assist in preparing mitigation for the sentencing hearing was "more than capable of performing this type of work." Mann, 959 S.W.2d at 527. The petitioner contends in his brief that this issue was not decided in the context of an ineffective assistance claim. We point out that even though the post-conviction court

stated that the issue had been previously determined, it is clear from the language above that the post-conviction court considered the issue under Strickland. We agree with the post-conviction court's finding that the petitioner has failed to show prejudice on this issue.

(3) Sufficiency of the investigation: The post-conviction court found:

> Petitioner argues that Mr. Kelly's investigators did not interview all of the prosecution witnesses, specifically all of the police officers. The investigators did collect school and hospital records but did little investigative work in the mitigation area. The local District Attorney General has an open file policy. The file material along with all of the statements of the officers and the investigation of the case was available to defendant's attorneys and their investigators. Defense counsel also pursued a motion to suppress where some if not all of the police officers were questioned. There is simply no evidence to suggest an insufficient investigation as a basis for ineffective assistance of counsel during the guilt or innocence phase of the trial and no evidence to show any prejudice in connection with the finding of guilt or innocence. This issue also has been previously determined on direct appeal. In connection with the sentencing phase of the trial, there was no real mitigation investigation. Counsel did have available for the sentencing phase immediate members of the Mann family. Mr. Mann's mother, father and wife testified. He also had Mr. William Redick, Dr. Kris Sperry and Dr. Gillian Blair. Adversary counsel as a part of trial strategy chose not to use Dr. Blair because she indicated to him that she would hurt him in this case. Dr. Sperry was used to challenge one of the State's aggravating factors and on cross-examination helped to prove one of the aggravators. The issue of insufficient investigation in connection with the sentencing phase has been previously determined on direct appeal. Petitioner also fails to prove by clear and convincing evidence that he has been prejudiced in connection with this issue. Evidence that additional mitigation investigation would have caused a different result in the sentencing phase is insufficient for petitioner to carry his burden of proof.

Although the post-conviction court stated that this issue was previously determined, it is clear from the language above that the issue was considered by the post-conviction court under Strickland. We agree with the post-conviction court that the petitioner has failed to show that any additional investigation would have caused a different result in the sentencing phase.

(4) Failure to present mitigating evidence: The post-conviction court found:

> In connection with the sentencing phase, there certainly were some failures on the part of counsel to properly prepare. The failures involve the investigation and preparing of mitigation evidence and the hiring of a neuropsychologist and neuropsychiatrist. These issues were previously determined on direct appeal. Counsel was never able to obtain adequate financing to employ such experts or do the mitigation work that is now being suggested. The trial court ruled on these issues properly under the prevailing law in 1994. Consequently, there is no showing of deficient performance in this area and with the aggravating factors that were

considered by the jury there is a failure by petitioner to prove by clear and convincing evidence the issue of prejudice.

We find that the post-conviction court did consider this issue based on the language in the last sentence quoted above. We agree with the holding of the post-conviction court that the petitioner has failed to show prejudice on this issue.

(5) <u>Counsel failed to effectively utilize expert testimony</u>: The post-conviction court found:

> Post-Conviction counsel's final issue raised is failure of trial counsel to effectively utilize expert services. Again, this issue was previously determined on direct appeal. The trial court record reflects the efforts of trial counsel to obtain an investigator for mitigation services as well as expert witnesses. The Court gave him what services were available at that time and determined that those were all the services available under the law in 1994. This issue was argued on direct appeal and was previously determined by the Court of Appeals and the Tennessee Supreme Court so that it is not a proper argument in a post-conviction proceeding. Evidence introduced at the post-conviction hearing would suggest that there were other expert services available including Dr. Dorothy Granberry (social psychologist), Dr. Murray Smith (addictionologist), Dr. Pamela Auble (neuropsychologist) and Dr. George Woods (neuropsychiatrist). The evidence that these experts would have introduced is summarized hereinabove. This evidence would have little, if any, effect on the guilt or innocence phase of the trial, but certainly could have had some effect during the sentencing phase. In summary, Dr. Granberry would have been used to show that it was very difficult for Mr. Mann to trust his attorneys. To gain this trust, much more time needed to be spent both with Mr. Mann and his family in discussing the case with him and investigating the matter. It appears that petitioner's brother, Eddie Joe Mann, undermined all efforts of petitioner's attorneys to convince petitioner to plead guilty. Eddie Joe Mann had much more influence on petitioner than petitioner's attorneys. Additional efforts by trial counsel would, therefore, appear to have been useless. Dr. Auble and Dr. Woods would indicate that Mr. Mann has an organic problem in his brain that affects his ability to make executive decisions especially when he is under stress or in a stressful situation. Dr. Smith would have indicated that due to alcohol and drug abuse, he was even more stressed out and unable to deal with the situation.

> Trial counsel was unaware of these experts at the time of trial although he was in contact with the Capital Case Resource Center who evidently had knowledge of this type of evidence. Again, failure to obtain some of the investigative materials previously mentioned precluded trial counsel from furnishing enough information to raise these particular issues. However, trial counsel was precluded from obtaining this information by appropriate order of the Court and this issue has previously been determined on direct appeal. Any such failure would have been the direct result of inadequate financing which has been discussed above. Certainly with all of this additional information, trial counsel could have presented to the jury a more complete picture of Glenn Mann who was a young man troubled since childhood by

-42-

neurological impairments that may have created a sense of frustration as he failed to develop verbal skills. As set out herein, any performance that may have fallen below the constitutional standard of effective assistance of counsel during the sentencing stage has previously been determined on direct appeal. Petitioner also fails to show prejudice during the sentencing phase.

The aspects of the petitioner's claim on this issue that were not previously determined (i.e. inadequate financing) were considered by the post-conviction court under Strickland, and it was determined that the petitioner had failed to show prejudice. We agree with the determination of the post-conviction court.

Despite the petitioner's assertions that the post-conviction court failed to consider certain claims on the basis that they were waived or previously determined, the written order of the post-conviction court reveals that the court did consider all of the claims under the Strickland standard. We hold that the petitioner has failed to show prejudice regarding those issues.

## IV.   The trial court's analysis of the facts and its application of the law are clearly erroneous.

### A.  Incorrect Legal Standard

The petitioner asserts that the post-conviction court applied an incorrect standard in denying him relief. Specifically, he cites to the post-conviction court's language that "the Court finds that the petitioner failed to prove with this additional evidence that the outcome of the sentencing would have been different." He argues that this is not the correct standard, pointing out that "Strickland requires a showing of a reasonable probability of a different outcome, not a certainty as the court suggests."

The petitioner is correct in his assertion that, to establish that a deficiency resulted in prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." A reasonable probability is a probability sufficient to undermine confidence in the outcome. Strickland, 466 U.S. at 694, 104 S. Ct. at 2068. In short, a petitioner must establish that the deficiency of counsel was of such a degree that it deprived the petitioner of a fair trial and called into question the reliability of the outcome. State v. Burns, 6 S.W.3d at 463.

While the language used by the post-conviction court seemingly applied a greater standard of proof of prejudice as cited by the petitioner, the court later used the proper standard, *i.e.*, "Petitioner has failed to show by clear and convincing evidence any reasonable probability of different outcome in either the guilt or innocence phase or the sentencing phase." Additionally, in discussing the applicable law, the post-conviction court noted:

Petitioner must also establish that "there is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceedings would have been different." A reasonable probability is a probability sufficient to undermine the confidence in the outcome.

-43-

We conclude that the post-conviction court was aware of and applied the correct legal standard. It appears, given the length of its order denying post-conviction relief, the post-conviction court's misstatement of the legal standard to be applied was done in an effort to shorten the order. Moreover, as this Court reviews issues of ineffective assistance of counsel *de novo*, any complaint to the standard employed by the post-conviction court has since become moot. Thus, we find no error on behalf of the post-conviction court.

## B.  Findings of Lower Court Erroneous

The petitioner also asserts that the findings of the post-conviction court are erroneous as to matters of both law and fact. He claims that on different occasions in its order, the court reaches conclusions that are not supported by the evidence, *i.e.*, (1) "counsel did everything that he could do to seek additional funding for the defense for both investigation, mitigation, and expert witnesses," and (2) the petitioner "argues that the role of [trial co-counsel] was limited in this case and yet Mr. Ingram handled the voir dire examination and made opening statements and cross-examined several witnesses." Additionally, he argues that the post-conviction court failed to engage in any Cronic analysis.

Regarding trial counsel's attempts to secure funding for expert services, the record shows that he filed and argued motions to obtain funding for experts. These motions were denied, and the issues were raised on direct appeal. This Court and the Tennessee Supreme Court found no error in the trial court's denial of these motions. Although the affirmance of the lower court's denial on appeal is not conclusive as to whether counsel did everything he could to secure funding, the petitioner failed to present clear and convincing evidence that counsel failed to do something in respect to arguing and filing these motions. Indeed, while the petitioner offers suggestions as to what counsel could have done, there is no evidence that, had counsel done what petitioner suggests, the trial court would have granted funding. Moreover, the petitioner has not shown that, had additional funding been granted, the result of either the guilt or penalty phase would have been different.

The petitioner also contends that, despite the court's findings, he never argued that co-counsel's role was limited at trial but instead argued that lead counsel failed to sufficiently utilize co-counsel during pre-trial preparation. The record reveals that the post-conviction court correctly perceived petitioner's argument. The court wrote:

> Petitioner next argues that defense counsel failed to properly prepare for trial and failed to utilize co-counsel . . . . He argues further that [co-counsel] played no part in any mitigation investigation. Post-conviction counsel also argues that the trial attorneys had no theory of defense and neither attorney actually took any steps to prepare to defend [petitioner].

It is apparent from a reading of the record that the lower court properly considered petitioner's assertions and correctly found that the allegations were not proven by clear and convincing evidence.

Finally, the post-conviction court properly applied the Strickland standard, rather than the Cronic standard, to petitioner's claims of ineffective assistance of counsel. In United States v.

-44-

Cronic, 466 U.S. 648, 658, 104 S. Ct. 2039, 2046 (1984), the Supreme Court fashioned an exception to the Strickland prejudice prong reasoning that "there are circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." The Cronic court, actually in dicta, stated that in rare circumstances, prejudice might be presumed "without inquiry into counsel's actual performance at trial." Id. at 662, 104 S. Ct. at 2048. The Supreme Court noted:

> Circumstances of that magnitude may be present on some occasions when although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial.

Cronic, 466 U.S. at 659-60, 104 S. Ct. at 2047. Thus, the court carved out a narrow exception to the general rule that in ineffective assistance of counsel cases under the Sixth Amendment, a petitioner must prove that he or she was prejudiced by counsel's deficient performance.

Nonetheless, the Cronic exception may only be employed "if the record reveals presumptively prejudicial circumstances, such as an outright denial of counsel, a denial of the right to effective cross-examination, or a complete failure to subject the prosecution's case to adversarial testing." Scarpa v. Dubois, 38 F.3d 1, 12 (1st Cir. 1994) (footnote omitted). The Cronic exception is meant to encompass those types of conduct that are so antithetic to effective assistance of counsel, *e.g.*, lawyers who leave the courtroom for long stretches of time, that a case-by-case analysis simply is not worth the cost of protracted litigation. See, e.g., United States v. Mateo, 950 F.2d 44, 48-50 (1st Cir. 1991) (attorney failed to appear); Tucker v. Day, 969 F.2d 155, 159 (5th Cir. 1992) (defense counsel sat mute throughout entire resentencing proceeding); Green v. Arn, 809 F.2d 1257, 1259-64 (6th Cir. 1987), vacated, 484 U.S. 806, 108 S. Ct. 52 (1987), reinstated, 839 F.2d 300 (1988), cert. denied, 488 U.S. 1034, 109 S. Ct. 847 (1989) (defense counsel absent from courtroom during critical stage of trial). However, attorney errors particular to the facts of a case are qualitatively different. Indeed, the Supreme Court warned that, in most cases, a showing of actual prejudice remains a necessary element and is required where the fundamental fairness of the challenged proceeding has not been affected and the integrity of the legal process has not been jeopardized. See generally United States v. Swanson, 943 F.2d 1070, 1073 (9th Cir. 1991).

The errors alleged by counsel in the instant case are not the type in which prejudice will be presumed. Thus, Strickland, and not Cronic, supplies the appropriate standard for assessing trial counsel's performance in the instant case. This challenge is without merit.

## C. Post-Conviction Court Failed to Address All Claims

The petitioner asserts that his petitions delineated numerous factual bases to support a finding of ineffective assistance of counsel. He now claims that the lower court failed to address the following arguments: (1) counsel failed to file pre-trial motions seeking special voir dire rules, (2) trial and appellate counsel failed to file any motions or raise issues asserting the petitioner's rights under international law, (3) the petitioner was sentenced to death in violation of both the United States and Tennessee Constitutions in that the aggravating factors were elements of the offense and

-45-

not submitted to the grand jury in violation of <u>Apprendi v. New Jersey</u>, 530 U.S. 466 (2000), and (4) the Tennessee capital sentencing scheme facially violates both the United States and Tennessee Constitutions.

The petitioner presented no evidence at the post-conviction hearing that the failure to seek special jury voir dire rules in a capital case falls below an objective standard of reasonableness. Moreover, claims related to the constitutionality of Tennessee's death penalty statute were raised on direct appeal. <u>See</u> <u>State v. Mann</u>, 959 S.W.2d at 536. Accordingly, such claims are not cognizable in a post-conviction proceeding. Tenn. Code Ann. § 40-30-206(h).

## V. Conclusion

After a thorough review of the record and the law applicable to the issues raised herein, we find that the petitioner has failed to prove the allegations contained in his post-conviction petition. The judgment of the post-conviction court is affirmed.

_____
JOHN EVERETT WILLIAMS, JUDGE